1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                   EASTERN DISTRICT OF CALIFORNIA

7

8   UNITED STATES OF AMERICA,          No.  2:14-cr-00192-GEB

9                 Plaintiff,
                                       **ORDER RE DEFENDANT'S MOTION TO**
10       v.                            **SUPPRESS AND REQUEST FOR A**
                                       **FRANKS HEARING**
11  DONALD J. PEEL,

12                Defendant.

13

14            Defendant "moves to suppress all evidence obtained as a

15  result of [the March 20, 2014] warrantless search of his cellular

16  telephone  and  all  evidence  obtained  as  a  result  of  Siskiyou

17  County Search Warrants WPD 14-001 issued on March 21, 2014[,] and

18  WPD14-002 issued on March 25, 2014." (Def.'s Mot. to Suppress

19  ("Mot.") 1:16-21, ECF No. 9.) In essence, Defendant argues "the

20  [March 20, 2014] search of the cellular phone was unlawful

21  without a warrant," and the two referenced search warrants were

22  issued without probable cause. (Id. at 4:19-20, 5:13-6:18.)

23  Defendant also contends material facts were omitted from the

24  referenced  search  warrants  concerning  the  alleged  victim's

25  credibility, requiring a hearing under Franks v. Delaware, 438

26  U.S. 154 (1978). (Id. at 6:21-7:24.)

27            The  government  opposes  the  motion  to  suppress  and

28  request for a Franks hearing.

                                    1

# I. FACTUAL BACKGROUND

## A.   Defendant and L.P.'s March 19, 2014 Arrest

On March 19, 2014, an anonymous caller reported that a missing juvenile was accompanied by an older adult male near the Weed, California rest area. (CHP Officer Lazo's Narrative at 1, Ex. 3 to Mot., ECF No. 9-3.) California Highway Patrol ("CHP") Officer F. Lazo ("Lazo") responded to the rest area and "observed an older white male . . . with a blonde, white, female juvenile sitting at a bench in the rest area." (Id.) Lazo "made contact with both subjects" and was advised by the male subject that "CHP had towed his vehicle the day before." (Id.) "The male identified himself with his Nevada Identification Card as [Defendant] Donald Peel." (Id.)

Lazo asked the female if she had any identification. She responded that "she did not have any identification, and identified herself verbally as [L.P.][1]" (Id.) Lazo "told [L.P.] that [he] believed she was a missing at risk runaway . . . . [L.P.] told [Lazo] . . . she was an adult." (Id.) Lazo "asked [L.P.] if she would [remove] everything out of her pockets to confirm she did not have any identification. [She] agreed and pulled everything out of the pockets of the sweatshirt she was wearing." (Id.) As she did so, Lazo "observed a clear plastic baggie with a crystalline substance slip out of a roll of California Lotto tickets. . . . [L.P.] told [Lazo] she had never seen the baggie before[,]" and the sweatshirt "she was wearing . . . belonged to Peel." (Id. at 1-2.) Lazo "recognized

---

[1]    This order refers to the alleged victim as L.P. consistent with each party's use of "L.P." in briefs and Local Rule 140(a)(i).

the substance in the plastic baggie to be a controlled substance." (Id. at 1.)

Lazo "asked [L.P.] her relationship with Peel. [She] told [Lazo] Peel was her uncle. Peel told [another officer L.P.] was a daughter of a family friend." (Id.)

Lazo "placed [L.P.] under arrest[,]" and "explained to [her] that [he] felt she was possibly lying about her identity and . . . believed she was a juvenile." (Id.) Lazo "advised [L.P.] that due to her claim to being an adult[,] she would be booked at the . . . County Jail with adults. [L.P.] became scared and admitted she was only sixteen and her actual year of birth was 1997." (Id. at 2.)

Lazo "asked [L.P.] if she and Peel had a sexual relationship. . . . [L.P.] told [Lazo] she and Peel did in fact have a sexual relationship." (Id.) L.P. "told [Lazo] she and Peel had sexual intercourse the night before in a motel in Weed California." (Id.) Lazo ultimately arrested both Peel and L.P. (Id.) Peel was arrested for "unlawful intercourse with a minor and for possession of methamphetamine based on the fact that the methamphetamine was found with his lottery tickets." (Id.) L.P. was also "charged for the methamphetamine [since] both denied ownership." (Id.) L.P. was transported to the Siskiyou County Juvenile hall. (Id.)

**B.   March 21, 2014 Search Warrant**

The March 21, 2014 Search Warrant authorized the search of Defendant's 1999 Gold Chevrolet Suburban and Defendant's cellular telephone. (March 21, 2014 Search Warrant & Aff. ("March 21 Aff.") at 2, Ex. 1 to Mot., ECF No. 9-1.) The search warrant

1   authorized the search of the cellular phone for "information

2   which would tend to show who had . . . control over said item

3   when pornographic materials were recorded, viewed or downloaded,"

4   and "[a]ny images, descriptions, or videos of pornographic

5   materials." (Id.) The search warrant authorized, concerning the

6   vehicle, *inter alia*, the

7          remov[al of] samples [of] suspected blood and
       other physiological fluids; hair and fibers;

8          fingerprints, footprints, and other
       impressions left at the sexual assault scene;

9          and any and all instruments to aid and abet
       in the commission of sexual assault, clothing

10         of the suspect(s) and/or victim(s); [and]
       photos and film, developed and undeveloped.

11

12  (Id. (emphasis omitted).)

13       Weed Police Department Sergeant Steven Shannon

14  ("Shannon") authored the affidavit presented in support of the

15  March 21, 2014 Search Warrant. That affidavit contains, in

16  relevant part, the following information:

17       Shannon was contacted on March 19, 2014, and informed

18  that "CHP had located a 16 year old female subject with an older

19  male subject, and that the female told CHP that she had sex with

20  the male at a hotel in Weed, CA that was not consensual." (March

21  21 Aff. at 5.) Shannon was told that L.P. "was a runaway juvenile

22  out of Las Vegas, Nevada[,]" and that "CHP Officers had . . .

23  located methamphetamine which was possessed by [L.P.]" (Id.)

24  Shannon was also told L.P.'s father was contacted via telephone,

25  and the father reported L.P. "is a habitual runaway." (Id.)

26       Child Protective Services ("CPS") was "unavailable to

27  assist with a forensic interview of [L.P.] until . . . March 20,

28  2014. However, Corporal Ben Whetstine ("Whetstine") "decided to

1   get a summary of events from [L.P.] to determine what criminal

2   activity had taken place." (Id.) A rape crisis social worker was

3   present during Whetstine's interview of L.P. (Id.) At the start

4   of the interview, Whetstine "explained to [L.P.] what consensual

5   meant and what it meant to have something done without consent.

6   [L.P.] stated that she understood." (Id.)

7       Whetstine provided Shannon the following summary from

8   his interview of L.P.:

            [L.P.] stated that she was 16 years old
        and that she lived with her mom and dad . . .
        in Las Vegas, Nevada. She said that she ran
        away from home over a month ago. She stated
        that she knew PEEL prior to running away
        because he lived near her. When [Whetstine]
        asked [L.P.] why she left with PEEL, she
        stated because he was helping her to get
        "clean" from drugs. When Corporal Whetstine
        asked her what the nature of her relationship
        with PEEL was she stated, "Friends with
        benefits." . . . [L.P.] stated that they have
        penis/vaginal sex, oral sex, and that he
        inserts his fingers into her
        vagina. . . . [L.P.] stated [they had
        penis/vaginal sex] "four or five
        times[,] . . . he has performed oral sex on
        her about "30 times," and that he has
        inserted his fingers into her vagina about
        "20 times." [L.P.] stated that they started
        engaging in this activity a couple of months
        ago.

            [L.P.] stated that she had been on the
        road with PEEL and that they just entered
        California on the morning of (3/18/14) and
        they stopped in Weed, CA. After driving
        around Weed throughout the day they checked
        into room #3 at the Summit Inn Motel (90 N.
        Weed Blvd.) between 5:00 p.m. and 7:00
        p.m. . . . [L.P.] stated they had sex for
        about one hour [in the room] from about 10:00
        p.m. until 11:00 p.m. . . . [L.P. stated]
        they engaged in . . . him giving her oral sex
        . . . , him inserting his penis into her
        vagina, and him inserting his fingers into
        her vagina. [L.P.] stated that she was not
        "raped" but that she consented to all of the
        sexual activity.

> [L.P.] stated that PEEL did not ejaculate inside of her because he "could not ejaculate." She stated that he has to take pills in order to get an erection but that he doesn't ejaculate. . . .

> [L.P.] stated that they (PEEL and [L.P.]) only had sex the one time since entering California. When Corporal Whetstine advised [L.P.] that the age for consent in Nevada is 16 years old, [and] the age for consent in California is 18 years old[, L.P.] responded by saying that she wanted to change her statement to say that they did not engage in any sexual activity while in California. Corporal Whetstine then concluded his interview with [L.P.].

(Id. at 5-6.) "Whetstine stated both PEEL and [L.P.] were placed under arrest for possession of methamphetamine by the [CHP]."

On March 20, 2014, at approximately 8:30 a.m., "Whetstine contacted [Shannon] to see if he should conduct a forensic interview with [L.P. Shannon] informed [Whetstine] he should and to contact CPS for assistance." (Id. at 6.) Whetstine contacted CPS and requested they assist in a forensic interview with L.P. at Juvenile Hall. (Id.) "It was determined that CPS Social Worker Judy Carter would conduct the interview and that Corporal Whetstine would . . . be in the room . . . ." (Id.) Whetstine provided Shannon the following summary of L.P.'s statement to Carter:

> [L.P.] stated that she met PEEL sometime in November or December of 2013 and that she began having sex with him prior to them leaving Nevada. She stated that she ran away with PEEL so she could "get clean" from her drug use and that PEEL was going to assist her. [L.P.] stated that they left Nevada about a month ago in his vehicle and entered Arizona before coming to California. From California, they traveled up through Oregon and Washington, then returned the same way and ended up back in California. [L.P.] stated they were on their way to Nevada

1   because she wanted to go home. It was on
    their return trip to California that they
2   were stopped by law enforcement (CHP) and
    PEEL's vehicle was towed. [L.P.] stated that
3   they financed the trip by asking people for
    money. [L.P.] stated that since being with
4   PEEL she has never prostituted herself for
    money, nor was she asked or pressured to by
5   PEEL.

6       [L.P.] stated that she has been engaging
    in sex acts with PEEL that included PEEL
7   giving her oral sex; PEEL inserting his penis
    into her vagina, and his fingers in her
8   vagina. . . . [L.P.] stated that they had
    been engaged in this manner of sexual
9   activity in every state they went through
    including California, and that most of the
10  time the sexual activity took place inside of
    PEEL's vehicle (Vehicle number 1) which was
11  later determined to be a gold Chevy Suburban
    (AZ/BET4974). She stated that the night they
12  checked into the Summit Inn they engaged in
    sexual activity that included PEEL "licking"
13  her vagina, inserting his fingers into her
    vagina, and his penis into her vagina. [L.P.]
14  stated that at no time did PEEL ever threaten
    her and that the sexual activity was always
15  with her consent. When asked about the camera
    that was located in her property, she stated
16  that it didn't work and that it was not used
    to record sexual activity between she and
17  PEEL. However, she stated that PEEL may have
    used his cellular phone to record them having
18  sex at some point but didn't remember what
    state they were in when he did that. Though
19  [L.P.] initially stated she didn't want PEEL
    to get in trouble, when it was explained to
20  her that he violated the law, she stated that
    she was starting to understand that he had
21  been taking advantage of her.

22  (Id. at 7.)

23      "After the interview, Corporal Whetstine [went] to the

24  Siskiyou County Correctional Facility where he took possession of

25  PEEL'S cellular phone which was provided to him by the jail staff

26  after it was retrieved from PEEL's property." (Id.) "Whetstine

27  checked it for any evidence, incident to arrest. Corporal

28  Whetstine stated though he located pictures of [L.P.] in PEEL'S

                                   7

phone, none of them were lewd or sexual in nature, nor were any videos located. The phone was booked into evidence at WPD." (Id.)

        In support of the March 21, 2014 Search Warrant, Shannon avers:

> Based on training and experience, [Shannon] knows that persons who illegally view pornographic images which contain minors, or have sexual relations with minors, often download them or save them to their cellular phone or other electronic device in order to allow them to "revisit them" or to view them at a later time for further sexual gratification. . . .
>
> Based on training and experience, [Shannon also] knows that persons who whom [sic] engage in sexual activities, whether legal or illegal, will often leave behind physical evidence at the scene including, but not limited to, blood and other physiological fluids; hair and fibers; fingerprints, footprints, and other impressions. [Shannon] further knows through training and experience that persons whom engage in sexual assault will often leave behind any instruments used to aid and abet in the commission of a sexual assault, clothing of the suspect(s) and/or victim(s); photos and film, developed and undeveloped; samples of paint, glass, and other fluids and solids that may have stained or adhered to the clothing and person of the victim(s) and suspect(s).

(Id. at 7-8.)

**B.   March 25, 2014 Search Warrant**

        The March 25, 2014 Search Warrant authorized the search of a Silver HandyCam video camera and a Blue Samsung T-Mobile cell phone for "information which would tend to show who had . . . control over said items when pornographic materials were recorded, viewed or downloaded," and "[a]ny images, descriptions, or videos of pornographic materials." (March 25, 2014 Search Warrant & Aff. ("March 25 Aff.") at 2, Ex. 2 to Mot.,

1  ECF No. 9-2.)

2          Shannon authored the affidavit presented in support of

3  the March 25, 2014 Search Warrant. That affidavit contains, in

4  relevant part, the following:

5              On Saturday, [March 22, 2014,] Crime
            Scene Investigator Mark Mazzoni of the Weed
6           Police Department served a search warrant on
            PEEL's vehicle which was being stored at
7           Bill's Towing in Weed, CA. During the warrant
            service, CSI Mazzoni learned from an employee
8           of Bill's Towing that PEEL was allowed to
            remove some items from the vehicle the day
9           before he was arrested for possessing a
            controlled substance. CSI Mazzoni was told
10          that PEEL removed a camera, a cell phone, and
            possibly an SD card or some other similar
11          storage device from the vehicle.

12              [Shannon] requested CSI Mazzoni contact
            the Siskiyou County Jail to ensure that PEEL
13          had none of the property with him at the
            Siskiyou County Jail. CSI Mazzoni stated he
14          contacted the Siskiyou County Jail and was
            informed that PEEL did not possess any of the
15          items that were reportedly taken from the
            vehicle.
16
            On Monday, [March 24, 2014] at approximately
17          [10:00 a.m., Shannon] requested CSI Mazzoni
            contact the Siskiyou County Juvenile Hall and
18          ascertain if the items that were taken from
            the vehicle were placed in [L.P.'s] property.
19          CSI Mazzoni informed [Shannon] that personnel
            from Juvenile Hall informed him that the
20          items were booked in as [L.P.'s] property.
            [Shannon] requested that CSI Mazzoni respond
21          to the Siskiyou County Juvenile Hall and
            seize any items of evidence from [L.P.'s]
22          property that he could locate.

23          CSI Mazzoni returned several hours later and
            informed [Shannon] that he had located a cell
24          phone with a charger, a Sony HandyCam video
            recorder, aluminum foil pieces, and a purple
25          vibrating erection ring. CSI Mazzoni placed
            all items of evidence into the Weed Police
26          Department evidence vault pending issuance of
            a search warrant to review the items seized.
27

28  (Id. at 7-8.)

1                               **II. DISCUSSION**

2      **A.    March 20, 2014 Warrantless Search of Defendant's**

3             **Cellphone**

4             Defendant seeks suppression of "all evidence obtained

5      as a result of [the] warrantless search of his cellular

6      telephone," arguing "the search . . . was unlawful without a

7      warrant." (Mot. 1:16-18, 4:19-20.)

8             The government rejoins that application of the

9      exclusionary rule to the warrantless search would be contrary to

10     the law. (Gov't Opp'n ("Opp'n") 10:20-21, ECF No. 11.) The

11     government argues:

12                 A California law enforcement officer
                   conducted a warrantless search of the
13                 defendant's cell phone at the jail after he
                   had been arrested. At the time that he did
14                 so, the search was permitted under binding
                   appellate judicial precedent: the California
15                 Supreme Court's decision in People v. Diaz[,
                   51 Cal. 4th 501 (2011)], that such searches
16                 were permitted as a search incident to arrest
                   and a search of a container. Diaz has
17                 subsequently been reversed by the United
                   States Supreme Court in Riley[ v. California,
18                 134 S. Ct. 2473 (2014)].

19                 But as the Supreme Court has explained
                   before in nearly identical circumstances,
20                 "[t]he police acted in strict compliance with
                   binding precedent, and their behavior was not
21                 wrongful. Unless the exclusionary rule is to
                   become a strict-liability regime, it can have
22                 no application in this case."

23
       (Id. at 11:23-12:2 (quoting Davis v. United States, 131 S. Ct.
24
       2419, 2428-29 (2011)).)
25
              "For the reasons below, [the Court] find[s] the good
26
       faith reliance exception applicable and therefore need not
27
       address whether [under the circumstances, the warrantless search

28
                                      10

1  of Defendant's cell phone violated the Fourth Amendment]." <u>United</u>

2  <u>States v. Crews</u>, 502 F.3d 1130, 1136 (9th Cir. 2007).

3       "The exclusionary rule bars the prosecution from using

4  at trial evidence that has been obtained through a violation of

5  the Fourth Amendment." <u>United States v. Shetler</u>, 665 F.3d 1150,

6  1156 (9th Cir. 2011). "The rule's sole purpose . . . is to deter

7  future Fourth Amendment violations." <u>Davis</u>, 131 S. Ct. at 2426.

8  "Despite the benefits of the exclusionary rule, significant

9  exceptions to the rule have developed. Under these exceptions,

10  evidence seized [in violation of the Fourth Amendment] will not

11  be suppressed." <u>United States v. Underwood</u>, 725 F.3d 1076, 1085

12  (9th Cir. 2013). "One such exception is the 'good faith'

13  exception established by [<u>United States v. Leon</u>, 468 U.S. 897,

14  926 (1984)], which is satisfied if an officer acts 'in

15  objectively reasonable reliance' on [a] warrant." <u>Id.</u> (quoting

16  <u>Leon</u>, 468 U.S. at 922).

17       In <u>Davis</u>, the Supreme Court applied the "good faith"

18  exception "when the police conduct a search in objectively

19  reasonable reliance on binding judicial precedent." <u>Id.</u> The

20  Supreme Court states in <u>Davis</u>:

21            The question in this case is whether to
          apply the exclusionary rule when the police
22        conduct a search in objectively reasonable
          reliance     on     binding     judicial
23        precedent. . . . The  search  incident  to
          Davis's arrest in this case followed the
24        Eleventh  Circuit's . . .  precedent  to  the
          letter. Although the search turned out to be
25        unconstitutional  under  [a  subsequently
          decided Supreme Court decision], all agree
26        that  the  officers'  conduct  was  in  strict
          compliance with then-binding Circuit law and
27        was not culpable in any way.

28

> Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis's claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system. The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any recurring or systemic negligence on the part of law enforcement. The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.

Id. at 2428-29 (internal brackets, quotation marks, and citations omitted).

"[The Court] understand[s] the Davis Court's reference to binding appellate precedent to mean that the caselaw of the jurisdiction must have been clear about whether that jurisdiction [authorized the search at issue]." Briscoe v. Md., 422 Md. 384, 408 (Md. 2011); accord United States v. Debruhl, 38 A.3d 293, 298 n.33 (D.C. 2012).

At the time of the warrantless search of Defendant's cell phone, "binding appellate precedent in [California], namely [Diaz], [authorized the warrantless search of cell phones incident to arrest. Corporal Whetstine] acted in objectively reasonable reliance on that authority when he searched [Defendant's cell phone on March 20, 2014]. It follows then, that the good-faith rule of Davis applies . . . ." Brisco, 422 Md. at 409-10.

For the stated reasons, the portion of Defendant's suppression motion seeking to suppress "all evidence obtained as a result of [the] warrantless search of his cellular phone" is DENIED.

**B.   The March 21, 2014 Search Warrant**

**1)   Whether Probable Cause Existed**

Defendant argues the affidavit submitted in support of the March 21, 2014 Search Warrant did not provide probable cause to search Defendant's cell phone or his vehicle. Specifically, Defendant contends:

> At the time the judge issued the warrant[,] the only evidence that the cellular phone might have evidence of a crime committed in California was the fact that (1) L.P. claimed that [Defendant's] phone might have been used to videotape sex and (2) Police had searched the phone and found no evidence to corroborate L.P.'s claim. In the affidavit, Sergeant Shannon never explained L.P.'s statement about why she suspected the phone might have been used to record sexual activity, instead he merely adopted L.P.'s conclusory suspicion - which may have been based only on the fact that the phone was present.
>
> . . . .
>
> The only evidence in the search warrant affidavit to suggest that the search of the vehicle might find physical evidence of a crime committed in California was that L.P. claimed that she and [Defendant] had sex in the vehicle. The affidavit clearly showed that no relevant evidence would be found in the vehicle, because the affidavit reported that L.P. stated that Mr. Peel is unable to ejaculate. In addition, the affidavit reported that L.P. stated that she and [Defendant] only had actual sexual intercourse in California in a motel, although there was allegedly four other times they had sexual intercourse in Nevada where the conduct was not criminal. Although L.P. reported oral sexual activity, if she was

13

truthful about Mr. Peel not being able to ejaculate there would be no physical evidence in the vehicle. Since L.P. reported sexual activity in the vehicle which was mostly legal where it happened and always was without bodily fluids there was no possibility that the search would find evidence of a California crime.

(Id. at 5:14-21, 6:1-13 (citation omitted).)

The government counters: "[i]n the 'totality of the circumstances,' there was a 'fair probability' that evidence would be found in the car and in the phone. The warrant was not issued without probable cause, and the magistrate was not clearly erroneous in so finding." (Opp'n 7:2-4 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983).) Specifically, the government argues:

With respect to the Chevrolet Suburban, [L.P.] told the agents that she and the defendant had essentially been living out of the suburban during their three week run. She also stated that they had sex in the car repeatedly during their time on the run. She stated that this included both vaginal intercourse and oral sex. She did tell the agents that, to the best of her recollection, the defendant cannot ejaculate. But the warrant sought far more than just evidence of ejaculation. It sought blood, hair, fibers, fingerprints, footprints, and other impressions. Evidence that there had been prior sex assaults against [L.P.], even if they occurred in the car outside California, would have been evidence to corroborate her allegations of statutory rape once they were inside California. It would also provide evidence to confirm (or undercut) her description of how she came to be standing with a 63 year old man at a rest area in Weed, California, hundreds of miles from her home in Las Vegas.

With respect to the defendant's cellular telephone, the affidavit established a fair probability that evidence would be found in the phone. The defendant misrepresents the

victim's description of the use of the phone to record their sexual encounters, calling it a "conclusory suspicion – which may have been based only on the fact that the phone was present." Not so. After telling the officers that she was certain that the video camera had not been used to record the defendant's rape of the child (because it does not work), she stated that "PEEL may have used his cellular phone to record them having sex at some point but didn't remember what state they were in when he did that." While she was not absolutely certain about the use of the phone, it is far more than a "conclusory suspicion" based only on the fact that the phone was present. Her stated uncertainty focused more on the question of where the recording might have happened, if it did happen.

(Opp'n 5:17-6:9 (citations omitted).)

"The probable cause standard for a search warrant is whether, based on common sense considerations, there was 'a fair probability that contraband or evidence of a crime would be found in a particular place.'" United States v. Ruiz, --- F.3d ----, 2014 WL 3377345, at *3 (9th Cir. 2014) (quoting United States v. DeLeon, 979 F.2d 761, 764 (9th Cir. 1992)) (brackets omitted). "For probable cause, an affidavit must establish a reasonable nexus between the crime or evidence and the [thing] to be searched." United States v. Crews, 502 F.3d 1130, 1136-37 (9th Cir. 2007); see also United States v. SDI Future Health, Inc., 568 F.3d 684, 702-03 (9th Cir. 2009) ("Under the Fourth Amendment, . . . there must be probable cause to seize the particular things named in the warrant." (internal quotation marks, citation, and brackets omitted)). "The magistrate judge need not determine 'that the evidence is more likely than not to be found where the search takes place. The magistrate need only conclude that it would be reasonable to seek the evidence in the

15

1  place indicated in the affidavit.'" Id. (quoting United States v.

2  Ocampo, 937 F.2d 485, 490 (9th Cir. 1991)) (ellipses omitted).

3            "[T]he issuance of a search warrant [is reviewed]

4  deferentially, upholding it if the issuing judge 'had a

5  substantial basis for concluding that probable cause existed

6  based on the totality of circumstances.'" Ewing v. City of

7  Stockton, 588 F.3d 1218, 1223 (9th Cir. 2009) (quoting

8  Greenstreet v. Cnty. of San Bernardino, 41 F.3d 1306, 1309 (9th

9  Cir. 1994)) (brackets omitted). "Thus, a judge's 'determination

10 that an affidavit provided probable cause to issue a search

11 warrant will be upheld unless clearly erroneous.'" Id. (quoting

12 United States v. Alvarez, 358 F.3d 1194, 1203 (9th Cir. 2004)).

13           Shannon's affidavit submitted in support of the March

14 21, 2014 Search Warrant includes a summary of the alleged

15 victim's forensic interview with CPS Social Worker Judy Carter,

16 in which L.P. stated she and Defendant had been engaged in sexual

17 activity including vaginal intercourse, Defendant performing oral

18 sex on her, and Defendant inserting his fingers into her vagina,

19 "in every state they went through including California, and that

20 most of the time the sexual activity took place inside of

21 [Defendant's] vehicle." (March 21 Aff. at 7.) These statements,

22 coupled with Shannon's averments based on his training and

23 experience that "persons [who] engage in sexual activities,

24 whether legal or illegal, will often leave behind physical

25 evidence at the scene including, but not limited to, . . .

26 physiological fluids; hair and fibers; fingerprints, footprints,

27 and other impressions," (id. at 8), provided a substantial basis

28 for the Magistrate Judge to conclude probable cause existed to

16

search Defendant's vehicle. "[I]t w[as] reasonable to seek the evidence [listed in the warrant] in [Defendant's vehicle]." Ruiz, 2014 WL 3377345, at *3 (stating "probable cause standard for a search warrant").

In contrast, Shannon's affidavit does not supply a "fair probability that . . . evidence of a crime would be found" on Defendant's cell phone. Id. The government contends the following statement contained in Shannon's affidavit provides probable cause to search Defendant's cell phone: "[L.P.] stated that [Defendant] *may have* used his cellular phone to record them having sex at some point but didn't remember what state they were in when he did that."[2] (March 21 Aff. at 7 (emphasis added).) However, the affidavit does not supply L.P.'s "basis of knowledge" for making this conclusory statement. United States v. Stanert, 762 F.2d 775, 779 (9th Cir. 1985) ("Although the tip in this case came from an informant who had demonstrated reliability, the information reported represents a bare conclusion which fails to reveal the informant's basis of knowledge . . . ."). "An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination." Underwood, 725 F.3d at 1081 (citations omitted); see id. ("Conclusions of the affiant unsupported by underlying facts cannot be used to

---

[2]    Shannon's affidavit also contains his averment that "persons who illegally view pornographic images which contain minors, or have sexual relations with minors, often download them or save them to their cellular phone or other electronic device. . . ." (March 21 Aff. at 7-8.) However, there is no information in the record that suggests Defendant has viewed child pornography, and the remainder of this averment is unclear.

establish probable cause."); see also United States v. Holzman,
871 F.2d 1496, 1511 (9th Cir. 1989) (indicating speculation
cannot "operate as a substantial basis" for probable cause),
overruled on other grounds by Horton v. Cal., 496 U.S. 128
(1990).   Here, no such underlying facts are provided.
Accordingly, under the "totality of the circumstances," the
Magistrate Judge did not have "a substantial basis" for
concluding probable cause existed to search Defendant's cell
phone. Ewing, 588 F.3d at 1223.

> **2)   Whether the Officers Acted in Good Faith Reliance on the Warrant**

The government contends that should the Court decide
the "magistrate was 'clearly erroneous' in issuing the [March 21,
2014] warrant, suppression would be inappropriate because the
agents relied in good faith on a warrant issued by a neutral
magistrate." (Id. at 7:6-8.)

"If a warrant lacks probable cause, evidence obtained
during its execution should generally be suppressed under the
exclusionary rule." Underwood, 725 F.3d at 1084. "However, in
United States v. Leon, the Supreme Court set out an exception to
the exclusionary rule for a search conducted in good faith
reliance upon an objectively reasonable search warrant." Crews,
502 F.3d at 1135-36 (citing Leon, 468 U.S. at 925). "The burden
of demonstrating good faith rests with the government."
Underwood, 725 F.3d at 1085.

"The [Supreme] Court in Leon identified four situations
that per se fail to satisfy the good faith exception. In these
situations, 'the officer will have no reasonable grounds for

believing that the warrant was properly issued.'" Id. (quoting Leon, 468 U.S. at 922–23). "If any of these four situations apply, . . . [the Court] 'need not inquire further' and can conclude that the good faith exception to the exclusionary rule does not apply." Id. (quoting United States v. Luong, 470 F.3d 898, 905 (9th Cir. 2006)). These situations include "where the affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Id. (quoting Leon, 468 U.S. at 923).

"An affidavit is so lacking in indicia of probable cause, or bare bones, when it fails to provide a colorable argument for probable cause." Id. (quoting United States v. Hove, 848 F.2d 137, 139–40 (9th Cir. 1988)). "A colorable argument is made when 'thoughtful and competent judges' could disagree that probable cause does not exist." Id. (quoting Hove, 848 F.2d at 139).

"Here, the affidavit submitted by [Shannon] in support of the state search warrant for [Defendant's cell phone] was so deficient as to render official belief in its existence entirely unreasonable." Underwood, 725 F.3d at 1086; see also Holzman, 871 F.2d at 1511 n.4 (indicating the good faith exception cannot be applied to overcome a "tenuous and speculative" nexus between the evidence sought and the item to be searched). "As discussed [above], the affidavit fails to set forth a sufficient factual basis for [L.P.'s conclusion that Defendant may have used his cellular phone to record them having sex at some point.]" Id. Therefore, the government has not shown that the good faith exception to the exclusionary rule applies.

### 3)    Whether a __Franks__ Hearing Is Necessary

Defendant requests an evidentiary hearing under __Franks v. Delaware__, arguing "Sergeant Shannon left out the following facts which were known to the police as reported in the police report of Officer Lazo[,]" and that "[b]y omitting these highly relevant facts[,] law enforcement gave the magistrate a false impression that L.P. was a reliable witness whose uncorroborated claims were sufficient to support probable cause." (Mot. 7:22-24.)

> [1.] L.P. claimed that she had never seen the baggie [of methamphetamine] before.

> [2.] According to Officer Lazo's report L.P. claimed that the methamphetamine in her pocket was not hers but was actually Mr. Peel's.

> [3.] According to Officer Lazo's report L.P. initially claimed to be an adult, but changed her age after being warned she would be detained with adults.

> [4.] [L.P.] also falsely claimed [Defendant] was her uncle. . . .

> [5.] Sergeant Shannon's affidavit also omitted evidence that L.P. admitted to being a former prostitute . . . .

> [6.] Sergeant Shannon's March 21, 2014 affidavit also did not include the fact that L.P.'s father had told law enforcement officers on March 20, 2014 that L.P. had been hospitalized at a psychiatric hospital on three occasions.

(__Id.__ at 3:17-4:7 (citations omitted).)[3]

---

[3]    Defendant also contends Shannon's affidavit omitted the facts that "L.P. was arrested for methamphetamine possession[,]" "[L.P.] initially claimed that Mr. Peel had raped her but recanted and claimed the sex was voluntarily[,]" and "L.P. admitted to being a former drug addict." (Mot. 3:19-22, 3:28-4:5.) However, each of these facts is contained in Shannon's affidavit. (March 21 Aff. at 5.)

1       The government counters a <u>Franks</u> hearing is not

2   warranted, arguing "[n]one of the[ referenced omissions] were

3   material, and none of them were vital to a determination of

4   probable cause." (Opp'n 15:22-24.) Specifically, the government

5   argues:

6           [L.P.] did not originally tell officers the
            truth about her age, or her relationship with
7           the defendant. She originally stated that she
            was 18 and that the defendant was her uncle,
8           before telling the truth that she was 16 and
            the defendant was a child molester. . . .
9
                The question is what effect, if any,
10          there would have been on probable cause in
            the affidavit if these initial lies were
11          included in the search warrant affidavit. The
            answer is that the search warrant's probable
12          cause would have been even stronger. . . .
            Why does a child . . . falsely claim that the
13          63 year old is her uncle, and falsely claim
            that she is 18 years old? The inference that
14          the magistrate would have to draw is that
            the . . . victim knew that [her] sexual
15          abuse . . . , if discovered, would land
            [Defendant] in prison for the rest of his
16          life. There is, in fact, no other rational
            reason for the . . . victim to . . . lie
17          about their relationship when first caught by
            the CHP. If these falsehoods had been
18          included in the affidavit, the probable cause
            would have been stronger, because it would
19          have provided additional inferences allowing
            the magistrate to conclude that the child's
20          report of sexual abuse was true.

21          . . . .

22              The defendant [also] faults the affiant
            for not reporting that the child was a
23          survivor of a child prostitution endeavor. It
            is unclear how a history of being victimized
24          as a juvenile prostitute (prior to this trip)
            would have affected the child's
25          believability. . . . The fact that she is the
            victim of a prior sex crime by other persons
26          does nothing to affect her credibility.

27          . . . . This omission, therefore, was not
            "material" to the determination of probable
28          cause, let alone "necessary."

1

2
    . . . .

3
      The minor's mental health issues, if known to the magistrate, would [also] have bolstered probable cause. The defendant, in a further effort to attack the child, simply writes that she has been hospitalized in a psychiatric hospital on three occasions, and that somehow this would have detracted from probable cause. . . .

4

5

6
    . . . . Given that the inconsistencies in [L.P.'s] version of events consistently deviate in the direction of protecting the defendant (which she candidly acknowledged in the third interview) the victim's [past mental health hospitalizations] would have increased the believability of her information because it would have made the magistrate aware of just how easily victimized she was in the hands of . . . the defendant.

7

8

9

10

11

12

13
(Id. at 14:26-17:22 (citations omitted).)

14
    "A defendant is entitled to an evidentiary hearing on

15
the validity of the affidavit underlying a search warrant if the

16
defendant can make a substantial preliminary showing that (1) the

17
affidavit contains intentionally or recklessly false statements

18
or misleading omissions," United States v. Reeves, 210 F.3d 1041,

19
1044 (9th Cir. 2000), and (2) "any omitted information is

20
material." United States v. Chavez-Miranda, 306 F.3d 973, 979

21
(9th Cir. 2002). "The [defendant] bears the burden of proof and

22
must make a substantial showing to support both elements." Id.

23
    The "evaluation of materiality requires . . . [the

24
Court to] consider the effect of any false statements or

25
omissions. . . . 'If the officer omitted facts required to

26
prevent technically true statements in the affidavit from being

27
misleading, the court determines whether the affidavit, once

28
corrected and supplemented, establishes probable cause.'" Ruiz,

1    2014 WL 3377345, at *3 (quoting Ewing, 588 F.3d at 1224). "If

2    probable cause remains after amendment, then no constitutional

3    error has occurred." Id. (quoting Bravo v. City of Santa Monica,

4    665 F.3d 1076, 1084 (9th Cir. 2011)).

5           Here, "the magistrate could have found probable cause

6    [to search Defendant's vehicle] even with [inclusion] of [the

7    referenced facts; therefore their] omission from the affidavit

8    was not material." Chavez-Miranda, 306 F.3d at 979. L.P.'s

9    statements consisted of "first-hand observations implicating

10   [Defendant.]" See Ruiz, 2014 WL 2277345, at *5 (indicating

11   citizen witnesses are "generally presumed reliable" and "detailed

12   eyewitness report[s] of a crime [are] self-corroborating"); see

13   also Ewing, 588 F.3d at 1225 ("Indicia of reliability include: 1)

14   the opportunity to view the criminal at the time of the crime.").

15   Further, L.P. "had no apparent motive to lie," concerning her

16   sexual relationship with Defendant, Ruiz, 2014 WL 2277345, at *5,

17   and certain information L.P. reported was corroborated,

18   bolstering her credibility. For example, L.P.'s father verified

19   she had run away from home, and law enforcement confirmed that

20   Defendant's vehicle was towed as L.P. reported. "Because of the

21   nature of what [L.P.] told the police and the circumstances in

22   which [s]he made h[er] statement[s], [the Court]

23   conclude[s]. . . the reliability component to the probable cause

24   inquiry [i]s satisfied." United States v. Patayan Soriano, 361

25   F.3d 494, 507 (9th Cir. 2003). Therefore, Defendant has not shown

26   his entitlement to a Franks hearing.

27          For the stated reasons, the portion of Defendant's

28   suppression motion seeking suppression of all evidence obtained

as a result of the March 21, 2014 Search Warrant is granted in part and denied in part as follows: it is GRANTED as to all evidence obtained as a result of the warranted search of his cellular phone and is DENIED as to all evidence obtained as a result of the search of his vehicle. Since the "invalid portion[] of the [March 21, 2014 Search Warrant] for the search of [Defendant's cell phone is] severable[,]" partial suppression "is proper under [the Ninth Circuit's] doctrine of severance." United States v. Sears, 411 F.3d 1124, 1129-30 (9th Cir. 2005); accord SDI Future Health, Inc., 568 F.3d at 706-07 ("[The Ninth Circuit] has endorsed a doctrine of severance, which allows a court to strike from a warrant those portions that are invalid and preserve those portions that satisfy the [F]ourth [A]mendment." (internal quotation marks and citation omitted)).

   **C.    The March 25, 2014 Search Warrant**

        Defendant argues:

> the [March 25, 2014] warrant to search the second cellular phone was based on no evidence whatsoever that it was used to commit any crime. Similarly, the warrant for the video recorder issued even though there was no evidence that it was used for any criminal activity[,] and L.P. specifically stated it was not even working.

(Mot. 5:22-26.)

        The government rejoins Defendant lacks standing to challenge the second warrant, arguing "defendant can[not] demonstrate why he had an expectation of privacy in the contents of a cell phone [and video camera] found among the victim's belongings." (Opp'n 9:23-25, 10:7.)

24

"To have standing to seek suppression of the fruits of [a] search, [Defendant] must show that he personally had 'a property interest protected by the Fourth Amendment that was interfered with, or a reasonable expectation of privacy that was invaded by the search.'" United States v. Lopez-Cruz, 730 F.3d 803, 807 (9th Cir. 2013) (ellipses omitted) (quoting United States v. Padilla, 111 F.3d 685, 688 (9th Cir. 1997)). "[A] person does not possess a reasonable expectation of privacy in an item in which he has no possessory or ownership interest." United States v. Thomas, 447 F.3d 1191, 1197 (9th Cir. 2006) (quoting United States v. Cormier, 220 F.3d 1103, 1108 (9th Cir. 2000)) (internal quotation marks omitted). The defendant "bears the burden of establishing standing." Lopez-Cruz, 730 F.3d at 807.

Here, the affidavit submitted in support of the March 25, 2014 search warrant states "the [two] items [to be searched] were booked in [the Siskiyou County Juvenile Hall] as [L.P.'s] property." (March 25 Aff. at 8.)  Further, Defendant "has not asserted . . . a property . . . or possessory interest in" those items. United States v. Portillo, 633 F.2d 1313, 1317 (9th Cir. 1980). Therefore, Defendant has not shown that he has standing to challenge issuance of the second warrant. See United States v. Hilton, 619 F.2d 127, 133 (1st Cir. 1980) ("[D]efendants have no 'standing' to contest the search of the briefcase, the camera, and the film canisters . . . since none of the defendants, either at the time of the seizure or at the suppression hearing, asserted any proprietary interest in the items seized."); see also United States v. Robinson, No. 1:10-CR-00129-MHS-RGV, 2010 WL 5662091, at *8 (N.D. Ga. Nov. 29, 2010) ("Here, all the

1  evidence in the record shows that the camera and computer

2  belonged to [a third party], and [the defendant] has presented no

3  evidence to show that . . . any item taken by law enforcement . .

4  . was his property or that he had any legitimate Fourth Amendment

5  interest in that property. Consequently, [the defendant] has not

6  shown that the [items] were seized in violation of his

7  constitutional rights.").

8         Accordingly, the portion of Defendant's suppression

9  motion seeking suppression of all evidence obtained as a result

10 of the March 25, 2014 search warrant is DENIED.

11                        **III. CONCLUSION**

12        For the stated reasons, the portion of Defendant's

13 suppression motion seeking to suppress all evidence from the

14 warranted search of Defendant's cell phone is GRANTED. Each other

15 portion of Defendant's suppression motion is DENIED.

16 Dated:  August 22, 2014

17

18

19 _____
   GARLAND E. BURRELL, JR.
   Senior United States District Judge

20

21

22

23

24

25

26

27

28