PHILLIP A. TALBERT
Acting United States Attorney
JILL THOMAS
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:14-CR-00192-KJM-CKD |
| Plaintiff, | UNITED STATES' OPPOSITION TO PETITIONER'S AMENDED § 2255 PETITION |
| v. | |
| DONALD J. PEEL, | |
| Defendants. | |

**UNITED STATES' OPPOSITION TO PETITIONER'S AMENDED § 2255 PETITION**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................1

II.     § 2255 PROCEDURAL HISTORY ...............................................................................1

III.    CASE PROCEDURAL HISTORY .................................................................................2

IV.     STATEMENT OF RELEVANT FACTS .......................................................................3

A.      GOVERNMENT'S CASE AT TRIAL ..........................................................................3

        1.      For nearly a month, while traveling through five western states, Peel
                repeatedly had sex with a developmentally challenged 16-year-old. ............3

        3.      LP asked Peel for help; instead, he transported her from Nevada to
                Arizona, drugged her, and had sex with her. ................................................5

        4.      Peel then moved LP through California, coached her on how to prostitute
                herself, and continued to have sex with her. ................................................6

        5.      Peel took LP to Washington where they stayed with Peel's relative. ...........7

        6.      LP repeatedly asked Peel to take her home to Nevada, but her requests
                were ignored. ...................................................................................................7

        7.      LP attempted to leave Peel while in Washington, but Peel trapped her in
                the car and drove off before LP could escape. ..............................................8

        8.      Peel was arrested in California on March 19, 2014. .....................................9

B.      PEEL ENGAGED IN AGGRESSIVE LITIGATION THAT FINALLY

        RESULTED IN THE DISMISSAL OF HIS FIRST INDICTMENT. ...................10

        1.      After the filing of a new Indictment, Peel continued to litigate
                aggressively through his attorney; Peel showed no interest in representing
                himself. ...........................................................................................................10

        2.      During trial, Peel denied any desire to represent himself. ..........................12

C.      DURING TRIAL, PEEL'S ATTORNEY VIGOROUSLY CROSS-EXAMINED

        WITNESSES AND SOLIDLY ATTACKED THE GOVERNMENT'S CASE IN

        CLOSING ARGUMENT. ..............................................................................................15

D.      AT SENTENCING, PEEL'S ATTORNEY ZEALOUSLY ADVOCATED FOR

        A LOWER SENTENCE, BUT THE COURT FOUND TWO APPLICABLE

        ENHANCEMENTS AND SENTENCED PEEL TO 210 MONTHS OF

        IMPRISONMENT. .........................................................................................................16

i

E.    MR. BEEVERS REBUTS ALL OF PEEL'S IAC CLAIMS; MR. BEEVERS'S
      CASE FILE SUPPORTS AND CORROBORATES MR. BEEVERS'S DUE
      DILIGENCE; AND TRIAL RECORD CONFIRMS HIS DILIGENCE ...............................17

F.    PEEL'S CONVICTION WAS AFFIRMED ON APPEAL AFTER PEEL'S
      APPELLATE ATTORNEY RAISED ALL MERITORIOUS CLAIMS. ...........................21

VI.   ARGUMENT ..........................................................................................................23

A.    PEEL BEARS THE BURDEN TO ESTABLISH INEFFECTIVE ASSISTANCE
      OF COUNSEL RESULTING IN PREJUDICE. ..................................................23
      1.    The Two-Prong *Strickland* Standard Governs Peel's Ineffective
            Assistance of Counsel Claims. ..................................................................23

            2.    There is a strong presumption that Peel's trial counsel's strategic
                  decisions were objectively reasonable. ...........................................23

            3.    Peel also bears the burden to show that any alleged ineffectiveness
                  undermines confidence in the verdict. ............................................25

B.    MR. BEEVERS PROPERLY AND ADEQUATELY INVESTIGATED THE
      DEFENSE CASE AND REASONABLY SELECTED TRIAL AND
      SENTENCING STRATEGIES AIMED AT IMPEACHING THE VICTIM'S
      STORY AND REDUCING PEEL'S SENTENCE (GROUNDS ONE, FOUR,
      SIX, SEVEN, EIGHT, TWELVE) ...............................................................25
      1.    Mr. Beevers Strategic Decision to Impeach the Victim and Government
            Witnesses Was Well Within the Wide-Range of Competent
            Representation. .....................................................................................26

            a.    Mr. Beevers made reasonable efforts to investigate any potential
                  helpful impeachment testimony of the victim and focused on a
                  strategic line of attack. .............................................................27

            b.    Mr. Beevers made reasonable efforts to investigate any potential
                  helpful medical testimony. ........................................................29

            c.    Mr. Beevers thoroughly investigated the case, interviewed
                  witnesses, evaluated evidence, strategized, and presented a
                  vigorous defense. ......................................................................30

            d.    Mr. Beevers thoroughly prepared for and presented solid
                  arguments to the court at sentencing, concentrating on a
                  constitutionally effective challenge to the government's
                  aggravation evidence and offering mitigation evidence. ............32

C.   **MR. BEEVERS EFFECTIVELY HANDLED PEEL'S *FARETTA* ISSUE BECAUSE PEEL WITHDREW HIS REQUEST TO REPRESENT HIMSELF (GROUND TWO)** ..................................................................35

    1.   Mr. Beevers was not ineffective when he followed his client's wishes to withdraw the *Faretta* request. ..........................................................35

    2.   Peel requested to represent himself, and then changed his mind, providing the path for Mr. Beevers to continue representing him. ...........36

D.   **MR. BEEVERS'S CONSIDERED AND STRATEGIC DECISION TO NOT REQUEST ACCESS TO THE VICTIM PRETRIAL AND TO NOT INFORM THE COURT ABOUT THE VICTIM'S WHEREABOUTS PRETRIAL SATISFIES *STRICKLAND* (GROUND ELEVEN).** ........................................37

E.   **MR. BEEVERS EFFECTIVELY HANDLED THE JURY INSTRUCTIONS AND PEEL HAS NOT ESTABLISHED PREJUDICE (GROUND TEN).** ...........39

F.   **APPELLATE COUNSEL WAS CONSTITUTIONALLY EFFECTIVE WHEN HE RAISED ALL MERITORIOUS CLAIMS, WHICH THE NINTH CIRCUIT REJECTED (GROUNDS FOUR, SEVEN, NINE, AND THIRTEEN).** ................40

G.   **PEEL'S CLAIMS OF PERCEIVED JUDICIAL UNFAIRNESS/BIAS OR PROSECUTORIAL MISCONDUCT ARE SPECULATIVE AND LACK MERIT (GROUND NINE).** ........................................................41

VII.   **CONCLUSION** ........................................................................43

# TABLE OF AUTHORITIES

## CASES

*Anders v. California*,
   386 U.S. 738 (1967)............................................................................................. 40

*Babbitt v. Calderon*,
   151 F.3d 1170 (9th Cir. 1998) ............................................................................. 33

*Bailey v. Newland*,
   263 F.3d 1022 (9th Cir. 2001) ............................................................................. 40

*Bell v. Cone*,
   535 U.S. 685 (2002)............................................................................................. 32

*Bergmann v. McCaughtry*,
   65 F.3d 1372 (7th Cir. 1995) ............................................................................... 34

*Blackledge v. Allison*,
   431 U.S. 63 (1977)............................................................................................... 41

*Bousley v. United States*,
   523 U.S. 614, (1998)........................................................................................... 18

*Bower v. Quarterman*,
   497 F.3d 459 (5th Cir. 2007) ............................................................................... 28

*Bragg v. Galaza*,
   242 F.3d 1082 (9th Cir. 2001) ............................................................................. 28

*Brown v. Hall*,
   2006 WL 3524503 (E.D. Cal. October 23, 2006)............................................... 29

*Campbell v. Wood*,
   18 F.3d 662 (9th Cir. 1994) ................................................................................. 25

*Cooper v. Fitzharris*,
   586 F.2d 1325 (9th Cir. 1978) ............................................................................. 23

*Darden v. Wainwright*,
   477 U.S. 168 (1986)............................................................................................. 24

*Eggeleston v. United States*,
   798 F.2d 374 (9th Cir. 1986) ......................................................................... 23, 28

*Faretta v. California*,
   422 U.S. 806 (1975)....................................................................................... 35, 36

iv

*Grayson v. Thompson*,
    257 F.3d 1194 (11th Cir. 2001) ................................................................................................ 24

*Grisby v. Blodgett*,
    130 F.3d 365 (9th Cir. 1997) .................................................................................................... 38

*Guam v. Santos*,
    741 F.2d 1167 (9th Cir. 1984) .................................................................................................. 24

*Harrington v. Richter*,
    562 U.S. 86 (2011).............................................................................................................. passim

*Hughes v. Borg*,
    898 F.2d 695 (9th Cir. 1990) .................................................................................................... 24

*James v. Borg*,
    24 F.3d 20 (9th Cir. 1994) ........................................................................................... 24, 39, 41

*Johnson v. Lockhart*,
    921 F.2d 796 (8th Cir. 1990) .................................................................................................... 26

*Jones v. Barnes*,
    463 U.S. 745 (1983)................................................................................................................... 40

*Kimmelman v. Morrison*,
    477 U.S. 365 ........................................................................................................................ 24, 25

*Knowles v. Mirzayance*,
    556 U.S. 111 (2009)................................................................................................................... 31

*LaGrand v. Stewart*,
    133 F.3d 1253 (9th Cir. 1998) .................................................................................................. 28

*Lambert v. California*,
    355 U.S. 225 (1957)................................................................................................................... 39

*Larson v. Palmateer*,
    515 F.3d 1057 (9th Cir. 2008) .................................................................................................. 42

*Lawson v. Caspari*,
    963 F.2d 1094 (8th Cir. 1992) .................................................................................................. 28

*Lema v. United States*,
    987 F.2d 48 (1st Cir. 1993)....................................................................................................... 27

*Lowry v. Lewis*,
    21 F.3d 344 ................................................................................................................................ 38

*Massaro v. United States*,
    538 U.S. 500 (2003) ............................................................................................... 35

*McCauley–Bey v. Delo*,
    97 F.3d 1104 (8th Cir. 1996) ............................................................................... 34

*McMann v. Richardson*,
    397 U.S. 759 (1970) ............................................................................................... 23

*Miller v. Keeney*,
    882 F.2d 1428 (9th Cir. 1989) ............................................................................. 40

*Odom v. United States*,
    455 F.2d 159 (9th Cir. 1972) ............................................................................... 35

*Pennsylvania v. Ritchie*,
    480 U.S. 39 (1987) ................................................................................................. 38

*People v. Marsden*,
    2 Cal. 3rd 118 (1970) ........................................................................................... 11

*Phillips v. Woodford*,
    267 F.3d 966 (9th Cir. 2001) ............................................................................... 31

*Reyes-Requena v. United States*,
    243 F.3d 893 (5th Cir. 2001) ............................................................................... 18

*Rios v. Rocha*,
    299 F.3d 796 (9th Cir. 2002) ............................................................................... 31

*Robinson v. Kramer*,
    588 F.3d 1212 (9th Cir. 2009) ............................................................................. 35

*Rogers v. Zant*,
    13 F.3d at 388 ........................................................................................................ 37

*Romero v. Tansy*,
    46 F.3d at 1030 ..................................................................................................... 34

*Runningeagle v. Ryan*,
    686 F.3d 758 (9th Cir. 2012) ............................................................................... 41

*Seymour v. Walker*,
    224 F.3d 542 (6th Cir. 2000) ............................................................................... 34

*Shah v. United States*,
    878 F.2d 1156 (9th Cir. 1989) ............................................................................. 39

*Strickland v. Washington,*
   466 U.S. 668 (1984).................................................................................................... passim

*Turk v. White,*
   116 F.3d 1264 (9th Cir. 1997) ......................................................................... 29, 30

*Turner v. Calderon,*
   281 F.3d 851 (9th Cir. 2002) .................................................................................... 25

*United States v. Addonizio,*
   442 U.S. 178 (1979)................................................................................................. 22

*United States v. Aichele,*
   941 F.2d 761 (9th Cir.1991) ........................................................................... 41, 42

*United States v. Brooks,*
   610 F.3d 1186 (9th Cir. 2010) ....................................................................... 39, 40

*United States v. Cochrane,*
   985 F.2d 1027 (9th Cir. 1993) ................................................................................ 24

*United States v. Espinoza,*
   866 F.2d 1067 (9th Cir. 1988) ................................................................................ 41

*United States v. Frady,*
   456 U.S. 152 (1982)................................................................................................ 22

*United States v. Hamilton,*
   792 F.2d 837 (9th Cir. 1986) .................................................................................. 24

*United States v. Harden,*
   846 F.2d 1229 (9th Cir. 1988) ................................................................................ 38

*United States v. Jingles,*
   702 F.3d 494 (9th Cir. 2012) .................................................................................. 35

*United States v. Knapp,*
   120 F.3d 928 (9th Cir. 1997) .................................................................................. 40

*United States v. McMullen,*
   98 F.3d 1155 (9th Cir. 1996) .................................................................................. 25

*United States v. Nolan,*
   910 F.2d 1553 (7th Cir. 1990) ............................................................................... 39

*United States v. Olano,*
   507 U.S.725 (1993)................................................................................................. 39

*United States v. Peel,*
  747 Fed. Appx. 498 (9th Cir. 2018) ............................................................. 21, 22, 35, 40

*United States v. Quintero-Barraza,*
  78 F.3d 1344 (9th Cir. 1995) ............................................................................................ 23

*United States v. Romero,*
  640 F.2d 1014 (9th Cir. 1981) ......................................................................................... 36

*United States v. Sanchez-Cervantes,*
  282 F.3d 664 (9th Cir. 2002) ........................................................................................... 23

*United States v. Schaflander,*
  743 F.2d 714 (9th Cir. 1984) ........................................................................................... 23

*United States v. Shaw,*
  885 F.3d 1217 (9th Cir. 2018) ......................................................................................... 40

*United States v. Smith,*
  780 F.2d 810 (9th Cir. 1986) ........................................................................................... 37

*United States v. Taylor,*
  802 F.2d 1108 (9th Cir. 1986) ......................................................................................... 23

*United States v. Thomas,*
  417 F.3d 1053 (9th Cir. 2005) ......................................................................................... 32

*Waters v. Thomas,*
  46 F.3d 1506 (11th Cir. 1995) ......................................................................................... 33

*Watts v. United States,*
  841 F.2d 275 (9th Cir. 1988) ........................................................................................... 41

*Williams v. Pennsylvania,*
  136 S. Ct. 1899, 195 L. Ed. 2d 132 (2016) ...................................................................... 42

*Woods v. Sinclair,*
  655 F.3d 886 (9th Cir. 2011) ........................................................................................... 25

*Woratzeck v. Ricketts,*
  820 F.2d 1450 (9th Cir. 1987) ......................................................................................... 24

*Woratzeck v. Ricketts.*
  859 F.2d 1559 (9th Cir. 1988) ......................................................................................... 24

## STATUTES

18 U.S.C. § 3553(a) ........................................................................................................ 16

28 U.S.C. § 2255 .............................................................................................. 1, 16, 22

U.S.C. § 2255 ................................................................................................................. 1

U.S.C. § 2423(a) ............................................................................................................ 2

## OTHER AUTHORITIES

*Tamplin v. Muniz*,
    2016 U.S. Dist. LEXIS 34814 ................................................................................. 36

PHILLIP A. TALBERT
Acting United States Attorney
JILL M. THOMAS
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Respondent/Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Respondent/Plaintiff,<br><br>            v.<br><br>DONALD J. PEEL,<br><br>                  Petitioner/Defendant. | CASE NO. 2:14-CR-00192-KJM-CKD<br><br>UNITED STATES' OPPOSITION TO PETITIONER'S AMENDED § 2255 PETITION |

## I.  **INTRODUCTION**

Before the Court is Petitioner Donald J. Peel's (hereinafter "Peel") motion to vacate and correct his sentence pursuant to 28 U.S.C. § 2255, originally filed on October 31, 2019, and amended on February 10, 2020.  CR 206, 213, 214.  For the reasons set forth below, the United States opposes the motion.

## II.  **§ 2255 PROCEDURAL HISTORY**[1]

On January 14, 2020, Chief District Judge Mueller referred the motion (CR 206) to Magistrate Judge Delaney.  CR 209.  On February 10, 2020, Peel moved to amend his 28 U.S.C. § 2255 motion.  CR 213, 214.  On March 16, 2020, the government filed a motion for extension of time to and including June 19, 2020, which this Court granted.  CR 215, 216.

---

[1] The § 2255 filing history is a truncated summary.  Peel has filed parallel compassionate release pleadings, which are pending.

1

On May 13, 2020, the government moved the Court for an order finding Peel waived any attorney-client privilege and permitting discovery in the case regarding Peel's alleged ineffective assistance of counsel claims in his § 2255 motion. CR 225. On July 20, 2020, Peel opposed the motion. CR 238. On August 24, 2020, Judge Delaney granted the government's motion and ordered limited discovery to occur by December 2, 2020. CR 249.

On October 21, 2020, the case was reassigned to a new AUSA due to the departure of the assigned AUSA. CR 264. By December 2, 2020, defense counsel had not yet provided discovery to the government as ordered by the magistrate judge. On February 2, 2021, Peel filed a motion to suspend the proceedings based on the government not filing its § 2255 response by January 5, 2021. CR 276. On February 9, 2021, Magistrate Judge Delaney granted Peel's motion and issued an order to show cause ("OSC"). CR 277. On February 19, 2021, the government responded to the OSC and moved the Court for an extension of time to obtain discovery. CR 278, 279. On March 2, 2021, Magistrate Judge Delaney granted the government's motion to extend time and discharged the OSC. CR 282.

### III. CASE PROCEDURAL HISTORY

Peel was arrested in California on March 19, 2014. PSR ¶ 4. He was initially indicted on April 10, 2014, for transporting a minor with the intent to engage in prohibited sexual activity. 18 U.S.C. § 2423(a); CR 5 (2:14-cr-106-GEB). That charge was dismissed on July 7, 2014, due to a defect in the indictment. CR 29. The same charge was refiled on July 17, 2014. 18 U.S.C. § 2423(a); CR 6 (2:14-cr-192-GEB). Thereafter, Peel, through his assigned assistant federal defender, Douglas Beevers, engaged in extensive motions practice. CR 9, 12, 15, 30, 45, 73, 83, 91, 98. Peel also filed a number of motions *in limine*. CR 25, 36, 106, 114. Peel proceeded to trial on November 5, 2014. CR 110. On November 18, 2014, a unanimous jury found Peel guilty of the offense alleged in the indictment. CR 142-43. On July 31, 2015, the Court sentenced Peel to 210 months of imprisonment and 240 months of supervised release. CR 165.

Peel is currently in the custody of the Bureau of Prisons. His release date, as projected by the Bureau of Prisons, is May 9, 2029.

2

# IV.  STATEMENT OF RELEVANT FACTS

## A.  GOVERNMENT'S CASE AT TRIAL

### 1.  For nearly a month, while traveling through five western states, Peel repeatedly had sex with a developmentally challenged 16-year-old.

For nearly a month, Peel moved minor victim L.P. (hereafter, "LP" or "victim") through Nevada, Arizona, California, Oregon, and Washington.  ER 297, 325.[2]  On that trip, Peel had sex with LP almost every day, and sometimes three or more times a day.  SER 664-67, 706.  Peel brought pills on the trip to help him get an erection; he kept LP on drugs, including heroin and methamphetamine; and along the way he acquired at least one sex toy that he used on LP.  SER 18-19, 31-32, 396-97, 408-10, 420, 651-56, 678-81.  Peel was ultimately arrested on March 19, 2014, in Weed, California, after having sex with LP the previous night.  PSR ¶ 4.  He was 63 years old at the time.  SER 4.  LP was 16 years old and had developmental problems.  PSR ¶¶ 3, 5; SER 622-23; 531-33, 505, 698.  Peel never told LP his name. SER 634.

### 2.  LP and Peel met in Las Vegas when she was 16 and he was 63.

In 2014, LP resided in Las Vegas.  SER 623-24.  She was 16 years old at the time and had dropped out of school.  SER 625, 629, 636.  LP and her family were living at a weekly motel called the Manor Suites.  SER 624.  LP's parents were unemployed, and LP was a habitual runaway who struggled with drugs.  SER 298, 623-24, 632; PSR ¶ 5.  LP's sister, Cassie, described her as being easily manipulated.  SER 622-23.  A police officer, who encountered LP after she tried to pet a rabbit, said LP appeared "more childish" than other teenagers.  SER 532.  Peel described LP as having a "mental issue." SER 531.

LP met Peel when he was with one of LP's friends.  SER 634.  Peel was 63 years old at the time and lived in a nearby apartment complex.  SER 4, 640.  He introduced himself to LP as "Soloo" (pronounced "Solo") and asked her to come to his apartment to smoke methamphetamine.  SER 634-35. LP went to Peel's apartment where they smoked methamphetamine, which Peel provided.  SER 635,

---

[2] Attached to this pleading are relevant portions of Peel's Excerpts of the Record (ER) and the government's Supplemental Excerpts of the Record (SER) filed in the Ninth Circuit during Peel's direct appeal of his conviction.

638. While LP was high, Peel offered her $100 to have sex with him. SER 638. She agreed and they had sex, but Peel never paid her. SER 638. Nevertheless, LP started going to Peel's apartment about twice a week. SER 635. They generally smoked methamphetamine and sometimes had sex. SER 636. LP told Peel she was 16 years old within two weeks of meeting him. SER 636. He nevertheless continued to give her drugs and have sex with her. SER 636. Peel began taking LP to panhandle around Las Vegas about twice a week. SER 637-38.

In 2014, Peel had a girlfriend named Nicole Gorski, and they had been together for over nine years. SER 593, 607. Peel told Gorski that he used to be a "woman handler," or pimp. SER 615-16, 620. Shortly after they met, but after he knew LP's age, Peel asked LP to have a threesome with him and Gorski. SER 594-98, 639. LP was high at the time and agreed. SER 596, 639. After this sexual encounter, Gorski learned that LP was only 16 years old. SER 598-99. She told Peel, who already knew. SER 599. Despite both of them knowing LP's age, Peel and Gorski had a second threesome with LP. SER 600-01. LP was high during this sexual encounter as well. SER 600. Peel eventually stopped sleeping with Gorski and found excuses to be with LP. SER 602-06. Gorski became jealous and upset; she did not want Peel spending time with LP. SER 603-05 ("I didn't want her around.").

Peel suggested that Gorski clean up LP in order to prostitute her. PSR ¶ 11; SER 615-16, 619, 621. Peel told Gorski that LP would be a "good earner." That is, she would "make good money." PSR ¶ 11. Peel asked Gorski to "get her hair done, take her shopping, warm up to her . . . [s]o she'd feel more comfortable." SER 615. While Gorski paid Peel lip service, she never did what he asked. SER 615. Peel started buying LP gifts, and LP's older sister met Peel. SER 626-27. She told Peel that LP was only 16 years old. SER 628-29. Peel said he knew LP's age. SER 629. LP's older sister said Peel bought LP gift cards from Bath and Body Works and Victoria's Secret.[3] SER 630. Peel hid the fact that he was having sex with LP from LP's older sister. SER 631, 640. Peel later said, "I'm going to kidnap your little sister." SER 633. LP's older sister thought he was joking. SER 633.

///

///

---

[3] LP also testified that Peel gave her gift cards: one from Victoria's Secret and one from Gymboree. Gymboree is a children's clothing store. SER 642-43.

### 3. LP asked Peel for help; instead, he transported her from Nevada to Arizona, drugged her, and had sex with her.

Peel did what he threatened, and kidnapped LP. On February 19, 2014, LP called Peel for a ride. SER 640-41. She wanted to get off heroin. SER 644. Peel suggested getting out of town for a "few days." SER 699.[4] Ultimately, Peel agreed to give her a ride but he never helped her quit heroin. SER 645, 651-52. When Peel picked up LP, he told her they were going to Arizona to register his truck.[5] SER 641. LP believed Peel was doing this to support the story they told while panhandling (i.e., they were from Arizona). SER 641. When they left, the only clothes that LP had on her were the clothes that she bought at Gymboree with a gift card given to her by Peel. SER 642-44.

In Arizona, Peel gave LP methamphetamine and heroin. SER 651-56. Peel directly injected methamphetamine mixed with water into LP's veins, "using a string or something to tighten on my arm."[6] SER 31, 32, 408-10, 419, 654-56. He brought heroin with him, and he purchased methamphetamine from a supplier he knew in Arizona. SER 651-52. Peel performed oral sex on LP while in Arizona and may have had vaginal intercourse with her. SER 647-48, 700. Peel stayed in Arizona for about three days. ER 298.

Peel then took LP through California and Oregon. In California, Peel and LP purchased a cellular telephone for LP. SER 657-58. A false date of birth was provided for LP at sign-up and written on the box. SER 27-28, 659. This false date was created using the day and month of Peel's birthdate (as found on his driver's license) and a year that suggested LP was 18 years old (1995) rather than her actual birth year (1997). SER 1, 3, 659-60. With Peel's help, LP eventually obtained additional clothing. SER 660, 661. While on the trip, Peel purchased tampons for LP. SER 661-62.

While in California, Peel repeatedly had sex with LP. SER 662-67. LP estimated that, while in California (the first time), Peel had vaginal intercourse with her twice and performed oral sex on her (and digitally penetrated her) 10 or 11 times. SER 664-67. When Peel had sex with LP, she was usually

---

[4] LP thought this could help by getting her "away from the connections in Las Vegas." SER 644.

[5] Peel's "truck" was a 1999 Chevy Suburban registered in his name. SER 9-33; 431. The front, passenger door did not open. SER 504. This is where LP normally sat. SER 646-47 .

[6] Peel did this to LP several times during the trip. SER 696-697.

5

high.  SER 663, 665.

### 4.  Peel then moved LP through California, coached her on how to prostitute herself, and continued to have sex with her.

Peel talked with LP about prostitution while they were in California.  SER 668-69.  He said she could give truck drivers "blow job[s]" to make more money, and he coached LP on how to interact with her prospective tricks.  PSR ¶ 11; SER 669, 683-84.  Later, Peel told LP that in Las Vegas, "I could go to the bellman or bell captain and give them my card, and he'll find tricks for me."  PSR ¶ 11; SER 669; Peel was in California for about three nights and three days before he took LP to Oregon.  ER 298, 302.

Peel was in Oregon for about two days and one night before taking LP to Washington.  ER 302, 304.  While in Oregon, Peel continued to supply LP with drugs, and LP believed they continued to have sex.  SER 670-71.

Throughout the trip, Peel regularly engaged in sex with LP.  Peel engaged in three types of sexual activity with LP:  oral sex, digital penetration, and vaginal intercourse.  LP testified that Peel had some form of sex with her nearly every day on the trip, and sometimes three or more times a day.  SER 706, 664-67 (LP estimated that there were "[n]ot very many, but maybe three" days that Peel did not have some kind of sex with her while on the trip).

LP testified that, over the course of the entire trip, Peel had vaginal intercourse with her five times and that he performed oral sex on her 25 to 50 times.  SER 663, 665.  She testified that he usually digitally penetrated her while performing oral sex on her.  SER 666-67.  LP performed oral sex on Peel once.  SER 664-65.

Investigators found ExtenZe pills in Peel's truck around the time of his arrest.  PSR ¶ 7; SER 17-19, 396-97 ("male enhancement pills . . . pills that help a male have an erection").  LP saw those pills in the glove compartment while on the trip.  SER 709.  Both LP and Gorski testified that Peel placed rubber bands around the base of his penis during sex in order to maintain an erection.  SER 614, 695.

Later in the trip, Peel obtained two sex toys in Washington, one a vibrator that attached to a finger and the other a vibrating penis ring.  SER 672, 677-81.  Peel used the finger vibrator on LP's vagina, and he may have used the penis ring on her as well.  SER 679, 681 (she thought Peel used the penis ring, but could not remember).  Peel told LP that he used the finger vibrator on her because "he

thought [she] would like it." LP told Peel to stop. SER 679.

### 5. Peel took LP to Washington where they stayed with Peel's relative.

Peel took LP to Kahlotus, Washington and had sex with her there. Kahlotus is a small town with no stores or regular cell service. SER 519, 672, 674, 710. Peel and LP stayed in Kahlotus for about two weeks with Peel's niece, Christina Douglas ("Tina"). SER 495-97, 671-72; ER 304, 316. They eventually had to leave because Peel owed money to Tina's family. SER 684.

During that time, Tina was staying with her mother-in-law, Cynthia Douglas ("Cynthia"). SER 495-96, 506-07. Peel and LP slept in the same room and shared a bed at Cynthia's house. SER 498, 500, 672-73. Peel never told Cynthia LP's name. SER 497. While in Washington, Peel continued to have sex with LP, and he continued to give her methamphetamine. SER 673. LP was normally high when Peel had sex with her. SER 677.

During their stay in Washington, a police officer encountered Peel, Tina, and LP while investigating a suspected trespass and attempted rabbit theft. SER 532-33. During this encounter, Peel told the officer that LP was "scared of authority and [said] something about some mental issue [LP] has." SER 531-32. The officer said LP appeared to be more childish than what he would expect from a normal teenager. SER 532. LP admitted that she tried to pet the rabbit, which was caged next to Cynthia's house. SER 532-33. The officer ended the encounter and later confirmed LP's identity using Facebook. SER 534.

### 6. LP repeatedly asked Peel to take her home to Nevada, but her requests were ignored.

LP asked Peel multiple times for him to take her home; he did not. SER 675-76. Peel said he would take her to a bus station, but he never did. SER 676. LP was afraid of riding a bus. SER 676. She cried during the trip because she was so far from home. SER 676. LP usually cried at night because that was when she thought the most. SER 676-77. Peel did not want LP to tell her parents where they were. SER 682-83 ("He told me to lie to my parents."). LP believed Peel told her to lie because they were far from her home and because he was having sex with her. SER 683.

///

///

### 7.    LP attempted to leave Peel while in Washington, but Peel trapped her in the car and drove off before LP could escape.

While in Washington, LP tried to leave Peel.  SER 674-75.  She wanted to go home to Las Vegas with Maya, a girl she met in Kennewick, Washington.  SER 675.  When she went back to Peel's truck to get her things, LP told Peel what she wanted to do.  SER 675.  Peel did not let her out of the truck and drove away before she could exit the vehicle.[7]  SER 675.  Peel did not allow her to go home; instead, he took her back to Oregon, this time for about a week.  ER 316, 322-23; SER 675, 684-85.[8]

Peel continued to have sex with LP in Oregon.  As they had done for much of the trip, they lived out of the truck, sleeping in a motel only one or two nights.  SER 647-50, 685.  While in Oregon, Peel continued to give LP drugs and have sex with her.  SER 685-86.  While LP did not recall vaginal intercourse in Oregon, she said Peel continued to perform oral sex on her (and to digitally penetrate her) while there.  SER 685-86.  Peel brought LP into California on March 18, 2014.  ER 323.

Peel continued to have sex with LP in California.  On March 18, Peel was pulled over by the California Highway Patrol near Weed, California.  PSR ¶ 5; SER 687.  Peel's truck was towed and impounded.  SER 388-89.  Before they left the truck, LP gathered a few bags that contained their things.  SER 688.

After the truck was impounded, Peel checked in to the Summit Inn.  SER 689, 439-48, 313.  He left LP outside.  SER 689, 441-42.  Florency Parker, an employee at the motel, saw LP outside and recalled that Peel was "speechless" when she asked how many people would be staying in the room.  PSR ¶ 13; SER 436-37, 439, 444-45.  Peel refused to sign the guest register.[9]  PSR ¶ 13; SER 447-48.

While in California, Peel continued to have sex with LP.  SER 690.  At the Summit Inn that night, Peel had vaginal intercourse with LP, he performed oral sex on her, and he digitally penetrated

---

[7]    LP felt at this point she was being held against her will.  SER 702-03, 704.

[8]    The evidence indicates Peel was not taking LP home.  There was no incentive for him to return to Las Vegas, where he would have to contend with Gorski and LP's sister.  SER 603-05, 631.  While LP may have thought she was going to home and was "done having sex" (SER 686), Peel continued to have sex with her.  SER 701 ("I think I might have told him that [i.e., I did not want to have sex with him anymore], but we still ended up having it.")

[9]    Peel also lied to Parker, telling her his truck "broke down."  Parker gave Peel the name of an auto body shop, and he said he would "check into it."  SER 447-48.

her.  SER 690.  LP was high at the time.  SER 690.

The next day, Peel and LP left their bags at the motel while they went out to panhandle.  SER 451-54, 691-92.  Parker said that only one of the two beds in Peel's room had been slept in.  SER 455.

### 8.   Peel was arrested in California on March 19, 2014.

On March 19, 2014, two CHP officers were investigating a report of a missing child[10] when they encountered Peel and LP at a rest area near Weed, California.  SER 37-39, 309-10, 322.  Peel was argumentative and irritated.  SER 313-19.[11]  LP just stared at the ground.  She had no identification, and she was later described as "hungry" and "unkempt."  SER 317-20, 544-48.  Peel was temporarily detained.  SER 319.  Peel claimed he was a "family friend" and that he was helping LP get off drugs.  PSR ¶ 4; SER 364-65.  Peel, however, was unable to provide any information about LP's family.  SER 366.  When pressed by the officer, Peel became angry.  SER 367.

One of the officers found methamphetamine in the sweatshirt LP was wearing.  PSR ¶ 4; SER 369.  Peel said the drugs belonged to LP.  PSR ¶ 4; SER 331, 350.  During that conversation, one of the officers asked Peel if he was having sex with LP.  SER 331, 372.  Peel said no, but neither officer believed him.  SER 332-33, 372-73.  One of officers then questioned LP and began investigating a possible sex crime.  SER 333.  LP told the officer that she and Peel entered California the day before and had sex in a motel in Weed.  PSR ¶ 4.  Eventually, LP told the officer that she was only 16 years old and that she and Peel had traveled from Nevada to Arizona, and then through California, Oregon, and Washington.  PSR ¶¶ 4, 6.  LP said Peel had sex with her throughout the trip and that their sexual relationship began before leaving Nevada.  PSR ¶ 6.   Both Peel and LP were arrested for possession of methamphetamine.  PSR ¶ 4.  Peel was also arrested for unlawful sexual intercourse with a minor.  SER 334.

---

[10]  The officers were looking for a different child, one named Lauren who was about the same age as LP.  SER 348.

[11] Towards the end of the trip, while in California, Peel had all three kinds of sex with LP; these sex acts occurred the day before he was arrested.  SER 690.

**B.  PEEL ENGAGED IN AGGRESSIVE LITIGATION THAT FINALLY RESULTED IN THE DISMISSAL OF HIS FIRST INDICTMENT.**[12]

Peel litigated aggressively.[13]  He refused to exclude time at arraignment, and his attorney, Mr. Beevers, immediately began filing motions.[14]  CR 7 and 8.  About a week after arraignment, Peel demanded a trial at his first status conference.  CR 9.  It appears Mr. Beevers began requesting Rule 17(b) subpoenas around that time as well.  SER (Sealed) 761; CR 11, 23.

After his first two motions were denied, Peel asked for a new attorney.  CR 14, 15.  In response, on May 23, 2014, the Court held an *in camera* hearing.  SER (Sealed) 754-766; CR 15.  During the hearing, the Court stated, "I suspect you're going to be in the same situation with another lawyer, but I'm going to grant your request."  SER (Sealed) 759.  Peel, however, changed his mind:

> I don't want to come in and be pro se.  So the best thing to do is, I think, go ahead and I'll stick with [current counsel].

SER (Sealed) 766 (Peel noted, "As long as I'm kept abreast [i.e., served with all court papers] . . . I'm fine with that.").

After the hearing, Mr. Beevers filed two more motions on behalf of Peel.  CR 17, 19.  One of those motions resulted in the dismissal of the pending case.  CR 29.  Mr. Beevers was able to obtain a dismissal within three months of indictment.  CR 5, 29.

**1.  After the filing of a new Indictment, Peel continued to litigate aggressively through his attorney; Peel showed no interest in representing himself.**[15]

The grand jury returned a new indictment on July 17, 2014.  Peel refused to exclude time at

---

[12]  All references to the docket in this section related to case number 2:14-cr-106-GEB.

[13]  Peel is familiar with criminal litigation.  At the time of his appeal, he had been a defendant in 61 criminal cases that reached disposition (PSR ¶¶ 31-91), had been a defendant in 11 other criminal cases in which the charges were dismissed (PSR ¶¶ 95-105); and had had a number of other encounters with law enforcement (PSR ¶¶ 107-20).

[14]  Mr. Beevers filed the following motions:  (1) motion to suppress attorney-client communications; (2) motion to dismiss for outrageous government conduct; (3) motion to suppress cell phone evidence; and (4) motion to dismiss the indictment.  These motions were filed within 60 days of arraignment.  CR 8, 10, 17, 19.

[15]  All references to the docket in this section (and for the remainder of this response, except as noted) related to case number 2:14-cr-192-GEB.

arraignment.  CR 8.  The next day, Mr. Beevers began filing motions all over again.[16]  CR 9.  Peel

demanded a trial at his first status conference.[17]  CR 10.  It appears Mr. Beevers requested more Rule

17(b) subpoenas.  CR 32, 38, 62, 85, 87.

On August 20, 2014, Peel filed a handwritten letter dismissing his "present counsel" and the

Office of the Federal Defender.  CR 12 at 1.[18]  In his letter, Peel took issue with his attorney's motions

practice and other aspects of his representation.  CR 12 at 2-8.  Peel asked for new counsel to assist in a

*Marsden* hearing,[19] claiming he "does not have the skills to proceed . . . alone."  CR 12 at 1-2.

On August 22, 2014, the Court held a trial confirmation hearing.  CR 14.  The Court discussed

Peel's letter, finding that contrary to Peel's claims, "[Peel] does have an understanding of the law."  CR

171 at 3.  During an *in camera* hearing, the Court denied Peel's motion for new counsel.  SER (Sealed)

819 ("I believe that you are really disappointed that he's not making every . . . argument you want him

to make . . . [but] there is no good cause for appointment of a new lawyer"); *see* CR 171 at 9.  During

the *in camera* hearing, Peel reiterated that he did not want to represent himself:

> COURT:  You want to appoint a new lawyer, you don't want to represent
> yourself, right?
>
> PEEL:    Oh, no, sir.  No, sir.  I'm not – I'm not by any means capable of
> representing myself . . . I would not ever consider that . . .
> believe me, I thought of it, but I just know better . . . I better
> not.

---

[16]  Ultimately, Mr. Beevers filed the following on behalf of Peel:  (1) motion to suppress cell
phone and warrant evidence; (2) motion to dismiss indictment for duplicity; (3) motion to admit
evidence under Rule 412(b); (4) motion to dismiss indictment for failure to state an offense; (5) motion
to compel disclosure, preclude expert testimony, and continue trial to allow for government production;
(6) motion to suppress witness testimony (re: Gorski); (7) motion to exclude jail calls, emails, and
notebook (re: Gorski) or continue trial; (8) motion to permit Gorski to invoke marital privilege; and (9)
motion for reconsideration of Rule 412(b) decision.  CR 9, 15, 25, 30, 45, 73, 83, 91, 98.  In addition,
Peel's attorney filed six *in limine* motions and supplemental briefing.  CR 36, 106, 114.

[17]  Trial was set for September 16, 2014, with a trial confirmation hearing on August 22, 2014.
CR 10.

[18]  Many of Peel's complaints are captured in Ex. 6(b).

[19]  *People v. Marsden*, 2 Cal. 3rd 118 (1970) (allowing defendants in state court to fire court-
appointed attorneys).

1

2

> COURT:    Well one way to interpret the first sentence of your letter is that
> you've already fired [current counsel] and that you're
> representing yourself now.  But that wasn't your intent, then?

3

> PEEL:      It wasn't, no.

4

5   SER (Sealed) 785-86.  After the *in camera* hearing, Peel withdrew his speedy trial request and asked to

6   re-set the trial date.  CR 171 at 13-14.  The Court granted Peel's request.[20]

7          On August 25, 2014, the Court granted Peel's motion to suppress the evidence found on his cell

8   phone.  CR 13.  On October 10, 2014, the Court held a second trial confirmation hearing.  CR 27.  The

9   Court denied Peel's pending motion to dismiss the indictment, and it set a briefing schedule for a

10  subsequent motion to dismiss.  CR 27.  Peel confirmed for trial, which was set to begin on November 5,

11  2014.  CR 27, 28.

12         On October 27, 2014, Peel signed a letter/motion challenging his counsel's representation.  ER

13  82.  He claimed he mailed the handwritten document to the Court on Thursday, October 30, 2014.  ER

14  71.

15         On October 30, the Court issued a written order addressing all pending *in limine* motions.  CR

16  89.  On Monday, November 3, the Court issued a written order addressing the remaining pre-trial

17  motions.  CR 94.  The next day, the Court issued a written order denying Peel's motion for

18  reconsideration of its Rule 412(b) ruling.  CR 31, 103.

19              **2.  During trial, Peel denied any desire to represent himself.**

20         Trial began Wednesday, November 5, 2014.  Jury selection began at 9:00 am; it ended just

21  before 3:00 pm.  SER 167, 275.  The parties made their opening statements, and the government called

22  its first witness.  SER 275-99.

23         Trial continued the next day, November 6.  ER 20.  The jury was called into the courtroom

24  shortly after 9:00 am, and the judge asked the parties to speak at sidebar.  The judge told defense

25  counsel, "I received a letter from your client which I have not yet read, although I glanced.  The only

26

27         [20]  Trial was re-set for November 4, 2014, with a trial confirmation hearing on October 3, 2014.
    CR 14.  Trial was ultimately scheduled for November 5, 2014, with a trial confirmation hearing on
28  October 10, 2014.  CR 19, 20.

word I can remember is 'bullshit.' I'm not sure of the context [in] which it's stated." ER 20, 26. The

judge asked what should be done with the letter. Defense counsel, Mr. Beevers, asked that it be

withdrawn:

> COUNSEL: [M]y client had filed what he thought – he had filed an ex
> parte motion to fire his lawyer and go *Faretta*, but he
> told me he does not want to pursue that anymore. He
> would ask that it be returned to counsel.

> COURT: So I should give the letter to you now?

> COUNSEL: If that's okay. That's what he would like.

> COURT: Here's the letter.

ER 20-21. Mr. Beevers then changed topics, and the trial proceeded. ER 21. Eight witnesses testified

that day. SER 377. Peel himself made no mention of a desire to represent himself during the first two

days of trial.[21] SER 167-584; ER 20-22. The trial resumed on Wednesday, November 12. SER 587.

Nicole Gorski was the first witness that day. SER 588, 592. Before she testified, Mr. Beevers asked to

speak with the judge outside the presence of the jury:

> COUNSEL: The defendant is asking – has a request to fire me, I guess.

> . . .

> COURT: . . . are you indicating that he wants to represent himself?

> COUNSEL: I'm not sure, your honor. He just mentioned it to me . . .

> COURT: Can you talk to him and find out?

> COUNSEL: One moment, your honor.

> (Discussion between defendant and counsel off the record.)

> COUNSEL: Yes, your honor. It's about representing himself, and he
> believes there's a conflict of interest.

ER 22-23. The Court asked Peel to state his position. Peel read from the same handwritten

letter/motion that he had mailed on October 30 and that Mr. Beevers had withdrawn on November 6 at

---

[21] Peel also made no mention of a desire to represent himself on July 31, 2015, during an *in camera* proceeding after trial. SER (Sealed) 770.

13

sidebar.  ER 23-24; CR 123.  The Court clarified with Peel's counsel that this was the same document

discussed and withdrawn on November 6.  ER 24-27, 32.  Peel's counsel confirmed it was the same

document, and noted that Peel had previously decided that he did not want to represent himself:

> COUNSEL:   I had advised him that if he wanted to file a *Faretta* motion . . . He could just request to represent himself, and I would support it . . . We talked about it, and he didn't pursue that.  And that's what I asked – when I had his pleading withdrawn.
>
> COURT:   And so in connection with that document, you asked me at sidebar to return it to you . . . and that you would return it to Mr. Peel because he had decided that that document was not to be given to me.  Is that what you're talking about?
>
> COUNSEL:   Yes.
>
> COURT:   And now you're indicating that he wants to file that document?
>
> COUNSEL:   Yes, your honor.
>
> COURT:   . . . I don't know what else your client wants . . . does he want to represent himself, does he want another attorney, or does he want something else . . . ?
>
> COUNSEL:   Your honor, he's said he wants a conflict, which I assume means he want a new lawyer, but it could also mean he wants to represent himself.  I'd ask him to state which he prefers.

ER 25-26, 29-32.  The Court then sought clarification from Peel regarding what exactly it was that he

wanted.  ER 29-30.

> COURT:   Mr. Peel . . . do you want to represent yourself?  Yes or no?  Or maybe you can't say yes or no.  Do you want to represent yourself?
>
> PEEL:   No.
>
> COURT:   Are you seeking the appointment of another lawyer at this juncture of the proceedings?

PEEL:      I don't – I don't know if – I have a conflict and I would in the
           motion – I did not withdraw this motion. I did not counsel
           with my attorney.

COURT: All right, Just a moment. It appears to me that it's going to
           take Mr. Peel some time to respond to the question I just
           asked him [about appointing a new lawyer] . . .

COURT: . . . It appears to me that he was clear. He does not want to
           represent himself.

ER 30-31. At the defense request, the Court then filed the document and took a recess to read it. ER

31-33. Following the recess, the Court denied Peel's request to appoint a new attorney. ER 33-35 ("The

essence of that document contains a dispute that Mr. Peel states he has with his lawyer. And that dispute

centers on defense and litigation tactics that do not rise to a level sufficient for the appointment of a new

lawyer. . . . So therefore the motion for new counsel is denied.").

       After Peel's motion for a new attorney was denied, Peel's counsel asked to limit the direct

examination of Nicole Gorski along certain lines. SER 591-92. Having addressed these issues in prior

motions, the Court denied the renewed motion. SER 591-92. Gorski testified, and the trial proceeded.

On November 18, 2014, a unanimous jury found Peel guilty of the offense alleged in the indictment.

CR 142-43.

### C. DURING TRIAL, PEEL'S ATTORNEY VIGOROUSLY CROSS-EXAMINED WITNESSES AND SOLIDLY ATTACKED THE GOVERNMENT'S CASE IN CLOSING ARGUMENT.

       After engaging in robust and extensive motions practice, Mr. Beevers engaged in zealous

advocacy at trial. He repeatedly attacked government witnesses on cross-examination, including the star

government witnesses, Gorski and LP. ER 101-04; 108-13; 195-270; 278-81. The transcript of LP's

cross-examination spans approximately 78 pages wherein he impeached LP with her lies,

inconsistencies, motives to fabricate, bias, memory gaps and perception issues. ER 195-270; 278-81.

He, likewise, sought to create doubt in the government's case and theory of criminal liability, attacking,

among other other theories, the *mens rea* element. ER 292-93; SER 733-35.

15

**D.  AT SENTENCING, PEEL'S ATTORNEY ZEALOUSLY ADVOCATED FOR A LOWER SENTENCE, BUT THE COURT FOUND TWO APPLICABLE ENHANCEMENTS AND SENTENCED PEEL TO 210 MONTHS OF IMPRISONMENT.**

On July 31, 2015, Peel appeared for a lengthy sentencing hearing (spanning 55 pages of public transcript and 13 pages of a transcript from an *in camera* hearing).[22]  The Court considered the Guidelines, the parties' arguments and objections, the PSR, the victim's statement, Peel's statement, and the 18 U.S.C. § 3553(a) factors.  SER 71-72, 83-120.

After hearing the parties' arguments about the Guidelines, SER 83-110, the Court allowed Peel to allocute.  Peel told the Court:

> I didn't know when we left that I was committing any crimes, any crimes with her, or being out doing wrong . . . I was trying to help her.  It don't look like that, but that's what I ended up doing is helping her.

PSR ¶ 16; SER 110 (Peel also claimed he "stopped" LP from prostituting herself).

The Court found Peel's criminal history category to be II and the total offense level to be 34.  SER 110.  The total offense level included a two-level enhancement for obstruction of justice.[23]  SER 84, 94, 116.  The Court made the following factual findings regarding this enhancement:

> I presided over the trial, I heard the testimony [of Nicole Gorski], and there's no need for a hearing on it.  The record, the trial record, is sufficient.
>
> . . .
>
> There is ample evidence to support that enhancement, and the objection concerning that enhancement is overruled. [24]

---

[22]  Peel again asked for a new attorney at the sentencing hearing.  His motion was denied after an *in camera* hearing during which Peel indicated he and his attorney were able to communicate about sentencing.  SER (Sealed) 778-79 ("I am not presented with evidence that shows a complete collapse of communication or an inability to communicate on matters that make a difference about sentencing.").  Peel said he was in the process of preparing a § 2255 claim.  SER (Sealed) 774-76.

[23] Peel attempted to keep Gorski from testifying.  While in custody, Peel attempted to stop Gorski from testifying at trial.  Ex. 402-3 (". . . they think they got you as a witness . . . they trying to go forward with it.  Without you, they ain't got nothing.").  He did so, in part, by trying to get her to marry him.  SER 45-69.  He spoke with her on the phone, wrote letters, and filed motions.  Trial Exs. 400-2, 401-4, 402-2, 402-3, and 404-1 (calls); ER 45-69 (letters); CR 73, 83, 91, 106, 114 (motions).  He was unsuccessful.  Gorski received immunity and testified.

[24]  During trial, the government played recorded jail calls between Gorski and Peel.  SER 609-

SER 84, 94. Peel's attorney had previously acknowledged Peel's attempt to suppress Gorski's

testimony: "[I]t's clear that [Gorski] didn't want to testify. They're trying to figure out a way [for her]

not to testify." SER 117.

After considering Peel's allocution and the § 3553(a) factors, the Court made the following

findings:

> The trial record makes it absolutely clear that the defendant purposefully
> abused sexually that young child victim. That record also makes it
> obvious that he wooed her and groomed her to be his prostitute for
> financial gain. His long span of crimes, events, and utter disregard for the
> law [indicates] . . . he is a danger to society who remains undeterred even
> after countless run-ins with the law . . . It's a high likelihood that he will
> reoffend, and I cannot turn a blind eye to the nature and circumstances of
> the offense. They are despicable . . . [H]e did not indicate that he cared,
> and I don't think he still cares, about the emotional destruction he levied
> on her [the victim] and what he tried to do.

SER 120-21.

The Court sentenced Peel to 210 months of imprisonment followed by 240 months of supervised

release. SER 120-21.

### E. MR. BEEVERS REBUTS ALL OF PEEL'S IAC CLAIMS; MR. BEEVERS'S CASE FILE SUPPORTS AND CORROBORATES MR. BEEVERS'S DUE DILIGENCE; AND TRIAL RECORD CONFIRMS HIS DILIGENCE

In the attached declaration, Peel's trial defense attorney, Mr. Beevers, rebuts each of Peel's

individual ineffective of assistance claims. Ex. 4 at pgs. 1-10. Mr. Beevers has over 20 years of

criminal defense experience, mostly at the federal level. Ex. 4 at p. 1. In addition, Mr. Beevers has

specific experience representing clients accused of child exploitation and other sex crimes. Ex. 4 at p. 1.

In defending Peel, Mr. Beevers litigated aggressively. Ex. 4 at pgs. 1-10. At the outset, he won a rare

motion to dismiss the original indictment. CR 29. From there, after the government re-filed the

charges, Mr. Beevers filed several motions *in limine* and requested several Rule 17(b) subpoenas for

witnesses and evidence. SER (Sealed) 761; CR 11, 23. Mr. Beevers followed a sensible trial strategy

and zealously attacked the victim and other government witnesses at trial. ER 195-270; SER 617-18;

---

12. While discussing the recordings, Gorski testified that Peel did not want her to testify and that her testimony was a "big issue" for him. SER 610-11. She went on to say that Peel wanted to "have us be married . . . because he didn't want me to be up here on the stand." SER 612, 613-14 ("Without me, there would be no trial."), 617-18 ("if I didn't testify, he wouldn't be in as much trouble).

621; Ex. 4 at pgs. 1-10.  After conviction, Mr. Beevers remained steadfast in his approach at sentencing, which included diligent representation and reasonable arguments for a reduced sentence.  Ex. 4 at pgs. 6-7; CR 158; CR 164.

In response to each of Peel's claims, Mr. Beevers asserts, in summary, the following[25]:

1) Ground One –

    a.  Failure to investigate and failure to delay the trial midway through to impeach victim regarding a threat from a squad car:  Mr. Beevers did, in fact, investigate the case and thoroughly impeached the victim on cross-examination by pointing out inconsistencies, lies, contradictions, memory gaps, motives to lie, and bias. For example, Mr. Beevers discredited the victim's claim that Peel threatened her while he was handcuffed in the backseat of the Weed Police Department squad car because it was physically impossible since Peel was handcuffed and the victim made this claim for the first time at trial. Moreover, Mr. Beevers did not want to directly challenge her incredible testimony on this issue because it would have given her a chance to change her story or label it as a mistake.  Ex. 4 at pgs. 2-4 and 7-9.

    b.  Failure to present a defense with medical testimony:  Mr. Beevers did investigate the issue of Peel's ability to ejaculate in contravention to the victim's testimony.  Based on his review of medical literature and other research, Mr. Beevers strategically decided against using a medical professional because a medical professional would testify that some men can ejaculate in certain circumstances, but not in other circumstances.  This would not have contradicted the victim's trial testimony that Peel did not or could not ejaculate.  This was especially true considering they had sexual intercourse in a vehicle and used methamphetamine at the time of sexual activity.  Also, there was already lay

---

[25] Ground Three alleges that Peel is actually innocent, which was not raised on appeal. However, Peel has not "demonstrate[d] that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623, (1998).  A petitioner is actually innocent when he was convicted for conduct not prohibited by law.  *See Reyes-Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001) (sufficiency of the evidence was raised on appeal and rejected).  Grounds Six, Seven, Eight, and Twelve are repetitive and are answered herein accordingly.  Grounds Nine and Thirteen are allegations against appellate counsel and are likewise answered herein.

1    witness testimony from Peel's longtime girlfriend, Nicole Gorski, that Peel could and did

2    ejaculate during their relationship.  Ex. 4 at pgs. 3-4 and 7-8.

3       c.    Failure to investigate the case from the defense perspective:  Mr. Beevers did, in fact,

4           investigate the case from the defense perspective.  He used a defense investigator to

5           conduct interviews and gather evidence.  The defense team interviewed family members

6           of the victim, Nicole Gorski multiple times, and Peel's family in Washington State.

7           Witnesses that the defense wanted to testify were already available for trial – the

8           government called them in their case-in-chief.  Mr. Beevers and his team investigated the

9           crime, including interviewing Weed law enforcement personnel and hotel staff in Weed.

10          The police did not save relevant items from the hotel room to test for semen/DNA, so

11          there was nothing to test or corroborate.  As part of the defense strategy, Mr. Beevers

12          sought to discredit the police investigation and to impeach the various government

13          witnesses in a variety of ways.  Ex. 4 at pgs. 4-8.

14   2)  Ground Two – failure to inform the court about Peel's desire to represent himself pursuant to

15       a *Faretta* request prior to empaneling a jury.  Mr. Beevers did not believe that Peel had

16       actually requested to represent himself, and the judge confirmed this fact with Peel.  Mr.

17       Beevers declares under oath that Peel told him that he [Peel] wanted to drop the *Faretta*

18       request and withdraw the motion.  This conversation took place shortly before the trial – Peel

19       confirmed with Mr. Beevers that he no longer wanted to proceed *pro se*.  Relatedly, Mr.

20       Beevers asked the judge to return Peel's handwritten letter (Peel's written motion to

21       represent himself) because Peel had earlier told Mr. Beevers that he no longer wanted to

22       represent himself; Peel had previously "consented" to ask for the return of his motion

23       because he withdrew the *Faretta* request.  Mr. Beevers had received Peel's implied consent

24       because Peel wanted Mr. Beevers to continue representing him.  Ex. 4 at pgs. 4-5.

25   3)  Ground Four – failure to investigate for mitigation evidence for sentencing:  Mr. Beevers

26       interviewed witnesses and used appropriate mitigation evidence that he thought would be

27       most persuasive, including Peel's work history.  Mr. Beevers aggressively advocated for a

28       reduced sentence and fought to keep out sentencing enhancements.  Mr. Beevers filed a

lengthy sentencing memorandum and argued against a long sentence in a contentious sentencing hearing.  Mr. Beevers did not argue that drugs were not used in the commission of the crime because there was, in fact, evidence of drug use.  Nevertheless, counsel pointed to the victim's contradictory testimony where she stated there were no drugs used.  Still, Mr. Beevers did not believe it would be helpful to highlight the topic of drugs – it would not be a helpful mitigating fact.  Ex. 4 at pgs. 6-9.

4) Ground Five – failure to provide honest representation:  Peel states that Mr. Beevers asked him to lie on the stand and testify that he (Peel) had known the age of consent in California was 18.  Mr. Beevers, however, never told him to lie.  Mr. Beevers thought that Peel had lived in California before; and, as such, Mr. Beevers thought that Peel was trying to hide that helpful fact.  If Peel had known the age of consent in California, that would have been a good defense.  According to Mr. Beevers, Peel misperceived how Mr. Beevers explained the issue to him.  Ex. 4 at p. 7.

5) Ground Ten – failure to object to the Nevada jury instruction related to age of consent because it was unconstitutional:   Mr. Beevers requested jury instructions that would be helpful, including a mistake of age instruction, but the judge denied the request.  Instructions to the jury were the ones legally justified and raised by the evidence.  The defense proposed language for a jury instruction, the government requested supplemental language that was legally accurate, and the language was included in the final instruction.  As such, Mr. Beevers had no grounds for objection because the government was correct on the law.  Mr. Beevers also suggested helpful clarifying edits to the instruction, and the government did not object.  The instruction was not unconstitutional.  Ex. 4 at p. 9.

6) Ground Eleven – failure to request pretrial access to the victim and failure to inform the court about the victim's "pretrial detention:"  Mr. Beevers had no legal or factual justification to request pretrial access to the victim.  In addition, the victim had already changed her story many times, thus, the defense already knew a lot of information (bad facts) about her, so a further interview would not have been fruitful.  Also, in terms of the victim's "pretrial detention," Mr. Beevers did not know the specific pretrial whereabouts of the victim or the

20

1    circumstances of her housing.  From Mr. Beevers's perspective, if the government had done

2    something to obstruct her testimony, then it would have had to turn that over to the defense

3    pursuant to *Brady*.  The victim testified at trial that she was free to leave, so she was not

4    detained by the government.  There was no evidence that the victim was forcibly detained, so

5    this was a non-issue for the defense.  Ex. 4 at p. 9.

6          In addition to the declaration, Mr. Beevers's attorney case file supports and corroborates Mr.

7    Beevers's due diligence and it rebuts Peel's allegations related to failure to investigate.  Ex. 6(a) and (b),

8    Declaration of AUSA, attached email from defense counsel, and excerpts of attorney case file.  In fact,

9    excerpts of the file show that defense counsel investigated the claim related to the victim's testimony;

10   investigated the claim related to law enforcement and related surveillance video at the Weed Police

11   Department; interviewed witnesses; and subpoenaed witnesses and evidence.  Ex. 6(a) and (b).  The file

12   likewise contains Peel's repeated complaints to Mr. Beevers and Peel's "orders" to his counsel.  Ex. 6(a)

13   and (b).

14         Lastly, the trial record confirms Mr. Beevers's diligence and constitutionally effective

15   representation in the area of trial strategy and execution in the form of objections, cross-examination of

16   government witnesses, jury instructions, closing argument, and sentencing.  CR 151, 157, 158, 162, 164,

17   179; ER 5-6; 16; 36-70; 195-270; 278-81; 292-93; SER 70-121; SER 420-30; SER 456-62; SER 482-90;

18   SER 506-13; SER 534-38; SER 549-51; SER 576-85; SER 713-26; SER 733-35; Ex. 7 ("11/18/14 Tr.")

19   at 12:8-25; 13:1–14.

20   **F.  PEEL'S CONVICTION WAS AFFIRMED ON APPEAL AFTER PEEL'S
       APPELLATE ATTORNEY RAISED ALL MERITORIOUS CLAIMS.**

21

22         On August 28, 2018, a unanimous panel of the Ninth Circuit affirmed Peel's conviction in a

23   dispositional memorandum.  *See United States v. Peel*, 747 Fed. Appx. 498 (9th Cir. 2018).  Among

24   other findings, the Ninth Circuit ruled that:  1) there was sufficient evidence to sustain his conviction; 2)

25   the District Court did not abuse its discretion in applying the obstruction of justice enhancement; 3) the

26   District Court correctly denied Peel's *Faretta* request because Peel told the District Court several times

27   that he did not want to represent himself; and 4) the panel denied review of the ineffective assistance of

28   counsel claim because it did not meet the *Rahman* criteria because the case was "not the rare one in

which the record is sufficiently developed to permit determination of the issue or in which the legal representation was obviously inadequate." *Id*.

Here, in Grounds Nine and Thirteen, Peel alleges ineffective assistance of counsel against his appellate attorney for not raising several claims. First, Peel alleges ineffective assistance because his appellate attorney did not advance a claim that the District Court was sarcastic toward him [Peel] during the November 6, 2014 *Faretta* colloquy. CR 214. Second, he argues ineffective assistance because his appellate attorney did not raise an unfair/disparate sentence claim noted in Ground Four. CR 214. Appellate counsel, an experienced criminal trial and appellate attorney, asserts that all meritorious claims were raised on appeal. Ex. 5, Declaration of AUSA with attached redacted email, dated February 12, 2021.

## V.    STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a district court may discharge or re-sentence a defendant if it concludes that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. A petitioner may not prevail on a motion under § 2255 merely by showing that some error occurred before the trial court. Rather, relief is available only if "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979), abrogated on other grounds by rule (internal quotation marks and citations omitted). Indeed, a petitioner seeking relief in a collateral attack "must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."); *see also Addonizio*, 442 U.S. at 184 ("It has … long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.").

# VI.  ARGUMENT

## A.  PEEL BEARS THE BURDEN TO ESTABLISH INEFFECTIVE ASSISTANCE OF COUNSEL RESULTING IN PREJUDICE.

### 1.  The Two-Prong *Strickland* Standard Governs Peel's Ineffective Assistance of Counsel Claims.

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Harrington v. Richter*, 562 U.S. 86, 110 (2011) ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."). In *Strickland*, the Supreme Court established a two-pronged test that requires a defendant to establish by a preponderance of the evidence: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced his defense. *Id.* at 687; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1347 (9th Cir. 1995); *United States v. Taylor*, 802 F.2d 1108 (9th Cir. 1986). "If either prong is not met, [the Court] must dismiss the claim." *United States v. Sanchez-Cervantes*, 282 F.3d 664, 671 (9th Cir. 2002).

### 2.  There is a strong presumption that Peel's trial counsel's strategic decisions were objectively reasonable.

In order to satisfy the first prong of the *Strickland*, the defendant must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 685. The Constitution does not guarantee infallible representation. *Cooper v. Fitzharris*, 586 F.2d 1325, 1330 (9th Cir. 1978). To establish ineffectiveness, the defendant must identify the acts or omissions that are outside the broad range of reasonable professional judgment. *Id.* at 689-90; *Eggeleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986); *United States v. Schaflander*, 743 F.2d 714, 717-18 (9th Cir. 1984) *cert. denied*, 470 U.S. 1058 (1985). A defendant must prove serious derelictions on the part of counsel. *McMann v. Richardson*, 397 U.S. 759, 774 (1970). "The object of an ineffectiveness claim is not to grade counsel's performance." *Strickland*, 466 U.S. at 697. Rather, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

1  evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  The Court must determine

2  whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of

3  professionally competent assistance. *Id.* at 718.  To be unreasonable, the performance must be such that

4  "*no competent counsel would have taken the action that [the petitioner's] counsel did take*." *Grayson v.*

5  *Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis in original).

6         There is a strong presumption that counsel's conduct fell within the wide range of reasonable

7  representation. *Strickland*, 466 U.S. at 689; *United States v. Cochrane*, 985 F.2d 1027, 1030 (9th Cir.

8  1993); *United States v. Hamilton*, 792 F.2d 837, 839 (9th Cir. 1986).  Judicial scrutiny of counsel's

9  performance must be highly deferential because it is "all too tempting for a convicted defendant to

10  second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689.

11  Counsel's strategic choices made after thorough investigation of law and facts relevant to plausible

12  options are virtually unchallengeable. *Id.* at 690-91.  Trial counsel's strategic decisions are

13  constitutionally effective so long as they "might be considered sound trial strategy." *Darden v.*

14  *Wainwright*, 477 U.S. 168, 186 (1986).  Given the strong presumption in favor of competence, the

15  petitioner's burden of persuasion is a heavy one. *Kimmelman v. Morrison*, 477 U.S. 365 at 384.  Trial

16  counsel's inability to remember his reasons for conducting the trial in the manner that he did will not

17  overcome the *Strickland* presumption of effective performance. *Harrington*, 562 U.S. at 109 (a court

18  "may [not] insist counsel confirm every aspect of the strategic basis for his or her actions.  There is a

19  'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial

20  tactics rather than 'sheer neglect.'").

21         The objective reasonableness standard recognizes that defense counsel have a broad range of

22  tactical choices. *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Strickland*, 466 U.S. at 689-90

23  ("Even the best criminal attorneys would not defend a particular client in the same way.").  Counsel

24  need not recognize and assert every possible defense and argument. *Woratzeck v. Ricketts*, 820 F.2d

25  1450, 1453 (9th Cir. 1987), *vacated on other grounds*, 859 F.2d 1559 (9th Cir. 1988).  A tactical

26  decision by counsel that is not objectively unreasonable, but with which the defendant disagrees, does

27  not constitute ineffective assistance of counsel. *Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984);

28  *Hughes v. Borg*, 898 F.2d 695, 703 (9th Cir. 1990).  The Ninth Circuit has continuously warned it will

1    "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight."

2    *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994). Therefore, "the defendant 'must overcome the

3    presumption that under the circumstances the challenged action might be considered sound trial

4    strategy.'" *Turner v. Calderon*, 281 F.3d 851 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). As

5    with all ineffectiveness claims, Peel must show that Mr. Beevers engaged in specific acts or omissions

6    that were ineffective. *Woods v. Sinclair*, 655 F.3d 886, 907 (9th Cir. 2011), *judgment vacated on other*

7    *grounds*, 132 S. Ct. 1819 (2012).

8            **3.  Peel also bears the burden to show that any alleged ineffectiveness**
9                **undermines confidence in the verdict.**

10           In addition to overcoming the presumption that counsel's decisions were reasonable, a defendant

11   alleging ineffective assistance also "must show there is some reasonable probability that, but for

12   counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

13   probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at

14   694; *United States v. McMullen*, 98 F.3d 1155, 1157 (9th Cir. 1996). This standard is "rigorous" and

15   "highly demanding." *Kimmelman*, 477 U.S. at 381-82. In assessing prejudice, the Court must also

16   consider the applicable legal standard. *Strickland*, 466 U.S. at 695 (*e.g.*, when conviction challenged,

17   would fact finder have had a reasonable doubt, absent counsel's errors).

18           Peel's several performance-based ineffective assistance of counsel claims lack merit. This Court

19   should deny them all.

20   **B.  MR. BEEVERS PROPERLY AND ADEQUATELY INVESTIGATED THE DEFENSE
         CASE AND REASONABLY SELECTED TRIAL AND SENTENCING STRATEGIES
21       AIMED AT IMPEACHING THE VICTIM'S STORY AND REDUCING PEEL'S
         SENTENCE (GROUNDS ONE, FOUR, SIX, SEVEN, EIGHT, TWELVE)**
22

23           Peel claims that Mr. Beevers's failure to investigate the victim's assertion that Peel threatened

24   her from a police squad car while handcuffed was ineffective.[26] CR 214. He further claims that Mr.

25   Beevers's failure to present a defense grounded in medical testimony about Peel's ability to ejaculate

26

27           [26] Peel layers this claim with Mr. Beevers's failure to delay the trial and investigate mid-trial
     after the victim changed her story on the witness stand, which contradicted her earlier statement about
28   Peel's threat. CR. 214. The government responds to the whole of the allegation below.

was ineffective.  *Id.*  And, generally, Peel generally asserts that Mr. Beevers failed to investigate the case or interview the victim from the defense perspective, and, was, thus, ineffective.  *Id.*  Peel includes accusations, without evidence, that Mr. Beevers presented no mitigation at sentencing and that Mr. Beevers failed to honestly represent him.  *Id.*  Peel relies on nothing more than his hindsight perspective on how he would have attacked the government's case or which evidence he would have presented as compared to his experienced attorney's strategy.  Yet, Mr. Beevers effectively investigated and litigated the case by interviewing witnesses, employing a defense investigator to do the same, evaluating evidence, filing subpoenas for evidence, filing motions, and zealously advocating in Peel's defense and at sentencing.  Moreover, Mr. Beevers elected to pursue a defense strategy rooted in logic and based on his experience and judgment.  Thus, Peel's belated and preferred legal strategies are irrelevant, and do not demonstrate prejudice.

### 1. Mr. Beevers Strategic Decision to Impeach the Victim and Government Witnesses Was Well Within the Wide-Range of Competent Representation.

In choosing "an impeach the victim and government witnesses" defense angle, alongside an aggressive motion practice to vigorously defend Peel at every stage in the process, Mr. Beevers selected a well-trodden strategic road.  First, Mr. Beevers's considered decision to vigorously cross-examine the victim on her lies, inconsistencies, motives, and biases was sound defense strategy.  ER 195-270; 278-81.  Further, trial counsel pointed out the incredulous nature of the victim's testimony, that is, that Peel threatened her while he was handcuffed in police squad car (insinuating that the victim was lying because it would have been physically impossible to make hand-gesturing threats while handcuffed).  ER 278-79.

As the Supreme Court has stated: "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."  *Harrington*, 562 U.S. at 109.  Courts routinely conclude that challenging the government's case and arguing that the evidence is insufficient is more than enough to meet the constitutional requirement of effective representation.  *See, e.g., Johnson v. Lockhart*, 921 F.2d 796, 800 (8th Cir. 1990) ("Since the government has the burden of proving guilt beyond a reasonable doubt, it may not be necessary for the defense to introduce evidence to meet the constitutional requirement of

effective representation.  [Counsel] thought that he was faced with such a case.  Given the tenuous nature of the state's case against [defendant] and given that [counsel] did interview [defendant]'s alibi witnesses, [Counsel]'s trial strategy was not unreasonable.");  *Lema v. United States,* 987 F.2d 48, 54-55 (1st Cir. 1993) ("Where the prosecution's case is less than compelling … the risk of 'rocking the boat' may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony.").

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*  Moreover, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.*  "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.*  "In particular, what investigation decisions are reasonable depends critically on such information." *Id.*

### a. Mr. Beevers made reasonable efforts to investigate any potential helpful impeachment testimony of the victim and focused on a strategic line of attack.

This is not a case where Mr. Beevers made no effort whatsoever to investigate or evaluate a possible angle of impeachment regarding the purported threat by Peel while handcuffed in the police cruiser.  Rather, this is a case where Mr. Beevers reviewed the victim's statement, compared it to her trial testimony, evaluated the evidence in light of its implausibility, assessed the evidence in context of the police testimony, and ultimately came to a professional judgment that the victim had credibility issues and other defects that undermined her testimony.  ER 195-270; 278-79; Ex. 4.  Mr. Beevers had a fair knowledge of what all of the witnesses had to say on the issue of the threat. Ex. 4.  He chose not to try to locate surveillance footage because, in his experience, it would have been destroyed at that point – midway through trial and over several months after the event took place.  Ex. 4 at pgs. 2-3, 8; Ex. 6(a) at 3-7.  He also chose not to pursue any other police witness testimony on the topic because he had a solid

1  line of attack of the victim. *Id.* Instead, he reasonably chose to highlight her incredulous story and her

2  failure to raise it earlier. Ex. 4 and Ex. 6(a) at pgs. 1-7.

3          Mr. Beevers also elicited testimony from other witnesses that supported various defense theories,

4  including attacking the *mens rea* and a shoddy law enforcement investigation. SER 70-121; SER 420-

5  30; SER 456-62; SER 482-90; SER 506-13; SER 534-38; SER 549-51; SER 576-85; SER 713-26. Mr.

6  Beevers also vigorously cross-examined the victim about her imperfect memory, drug-induced

7  perception, and potential bias and motives. ER 195-270. He asked her a series of questions designed to

8  suggest that the victim was predisposed against Peel and motivated to testify favorably for the

9  government. ER 195-270. Taken together, Mr. Beevers's actions cannot be ineffective. *See LaGrand*

10 *v. Stewart*, 133 F.3d 1253, 1274 (9th Cir. 1998) (rejecting argument that counsel must personally

11 interview each witness); *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986) (stating trial

12 counsel does not need to interview witness if witness's account is fairly known to counsel). It was

13 wholly reasonable for Mr. Beevers, as a matter of strategy, to choose to counter testimony primarily

14 through vigorous cross-examination. *See Bower v. Quarterman*, 497 F.3d 459, 470-72 (5th Cir. 2007)

15 (affirming findings that trial counsel who considered expert testimony "was weak" and who "planned to

16 bring out those weaknesses on cross-examination" was not ineffective for failing to call a defense

17 expert, and effectively cross-examined prosecution experts so there was no prejudice). Mr. Beevers

18 represented Peel with vigor, conducted a skillful cross-examination of the victim, elicited concessions

19 from other government witnesses, and was able to draw attention to weaknesses in the government's

20 case and theory. *See id.* That Peel might have chosen other means to address this evidence is of no

21 consequence. A strategic decision to impeach a witness in a particular way that flows with the state of

22 the evidence does not constitute ineffective assistance of counsel and is not a basis for granting habeas

23 relief. Peel has failed to muster facts sufficient to overcome the strong presumption that Mr. Beevers's

24 conduct fell within the wide range of reasonable professional assistance.

25          Similarly, the "duty to investigate and prepare a defense is not limitless; it does not necessarily

26 require that every conceivable witness be interviewed." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.

27 2001) *amended on denial of rehearing*, 253 F.3d 1150 (9th Cir. 2001); *see also Lawson v. Caspari*, 963

28 F.2d 1094 (8th Cir. 1992) (counsel's decision not to call alibi witnesses based on reasonable trial

strategy, including extensive cross-examination of government witnesses); *Brown v. Hall*, 2006 WL 3524503 at *9 (E.D. Cal. October 23, 2006).  In assessing such a decision, court should apply "a heavy measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.  Once defense counsel makes a reasonable tactical decision to pursue one defense strategy, "the need for further investigation [of the other theory] may be considerably diminished or eliminated altogether."  *Id.  See also Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997) (finding counsel reasonably selected self-defense theory, discharging his duty to investigate competency defense).  In this case, Mr. Beevers reasonably investigated this line of inquiry and he pursued it in cross-examination based on the state of evidence. As such, he strategically determined it was the strongest angle of impeaching the victim on the topic of Peel's alleged threat to her while he was handcuffed in the back of a squad car.  No more was required.

### b.  Mr. Beevers made reasonable efforts to investigate any potential helpful medical testimony.

Trial counsel also tactically decided, after hours of medical research, not to sponsor medical testimony stating that men ejaculate or do not ejaculate based on the circumstances of the encounter, such as space (e.g. a vehicle), drug use, and myriad other reasons.  Ex. 4 at pgs. 3-4, 7-8.  This non-definitive evidence would have further *corroborated* the victim's testimony that Peel did not ejaculate on various occasions.  *Id.*  Mr. Beevers considered and investigated the medical issue that arose in the victim's testimony, that is, that Peel did not ejaculate [at varying times/locations]. Ex. 4 at pgs. 3-4, 7-8. Before trial, counsel spent a considerable amount of time learning about the ejaculation process, and he learned that the victim's testimony would not be inconsistent with a medical professional's testimony. Ex. 4 at pgs. 3-4, 7-8.  In fact, it was quite possible, especially considering drug use and in light of the erectile dysfunction pills found in the truck, that Peel did not ejaculate during sex with the victim.  This, again, corroborated the victim's testimony.  Nevertheless, defense had the information it needed to contradict the victim's "lack of ejaculation" testimony from a more reliable witness than an expert— Nicole Gorski.  ER 112.  Gorski, Peel's longtime girlfriend, testified that Peel did indeed ejaculate during their sexual encounters, thereby directly contradicting the victim's testimony.  ER 112. Therefore, not sponsoring medical testimony regarding ejaculation was a sound and logical decision based on the state of the evidence.  Ex. 4 at pgs. 3-4, 7-8.  Mr. Beevers's investigative efforts were

reasonable and discharged his duty to consider the viability of the purported helpful medical testimony. Based on his research and the state of the evidence, he reasonably concluded that the evidence would not have supported impeaching the victim, which was at the heart of the defense strategy. Ex. 4 at pgs. 3-4, 7-8. That ends the *Strickland* analysis.

### c. Mr. Beevers thoroughly investigated the case, interviewed witnesses, evaluated evidence, strategized, and presented a vigorous defense.[27]

Peel received exceptional representation in this case, despite Peel's constant complaints.[28] Ex. 4 and Ex. 6(b). Mr. Beevers took on his role with zeal: he personally interviewed witnesses, hired a defense investigator, filed several motions and subpoenas, and presented a cogent, reasonable trial strategy and sentencing case. CR 9, 15, 25, 30, 45, 73, 83, 91, 98, 106, 114; Ex. 4 at pgs. 1-10; Ex. 6(a).

From the beginning, Peel's counsel filed four motions and a number of Rule 17 subpoenas in Peel's first case (2:14-cr-106-GEB). And, at the outset, the Court granted a rare motion to dismiss the indictment within 90 days of arraignment. CR 5, 29. After Peel was re-indicted, Peel's attorney filed nine substantive motions, six motions *in limine*, and sought more Rule 17 subpoenas. CR 9, 15, 25, 30, 45, 73, 83, 91, 98, 106, 114; Ex. 4 at pgs. 1-10; CR 11, 23, 32, 38, 62, 85, 87; SER (Sealed) 761. One of those motions resulted in the suppression of the evidence on Peel's phone. CR 13.

At trial, Mr. Beevers extensively cross-examined the government's star witnesses—the victim and Ms. Gorski—in the presence of the jury; ultimately, he molded his strategy as one of discrediting the victim, attacking other government witnesses, and demonstrating the weaknesses in the law enforcement investigation itself. ER 101-04; 108-13; 195-270; 278-81; SER 420-30; SER 456-62; SER 482-90; SER 506-13; SER 534-38; SER 549-51; SER 576-85; Ex. 4 and Ex. 6(a). In closing argument,

---

[27] In Ground Five, Peel also alleges that Mr. Beevers did not provide him honest representation because he told Peel to lie on the witness stand about his [Peel's] knowledge of the age of consent in California was 18. Mr. Beevers never told him to lie. Ex. 4 at p. 7. Mr. Beevers thought Peel had lived in California before; and, as such, he thought he was trying to hide that fact and that would have been a helpful fact. *Id.* And, if he did know the age of consent in California, that would be good for the defense. *Id.* From Mr. Beevers's perspective, Peel misperceived how Mr. Beevers explained the issue to him. *Id.* Peel states that Mr. Beevers told the court in a pleading that there would evidence about Peel's knowledge of the age of consent in California. CR 214. While Mr. Beevers did file a pre-trial pleading in this regard just in case it was a fact he *could* testify to, it was not something the defense used at trial because Peel never testified. Ex. 4 at p. 7.

[28] The district court found that Peel's dispute with his attorney "centers on defense and litigation tactics." ER 33-35.

1  Mr. Beevers, for example, argued that Peel did not cross state lines *with the intent* to have sexual

2  activity—attacking the *mens rea* element.  ER 292-93; SER 733-35; Ex. 4.

3      Peel resurrects in Ground Seven his arguments about counsel's ineffectiveness in not objecting

4  to the government's argument about Peel's intent before he crossed state lines into California on March

5  18.  CR 214.  By the time the case reached closing arguments, Peel's attorney was faced with

6  overwhelming evidence of his client's guilt.  Peel's attorney was not ineffective for failing to object to

7  the government's argument about Peel's intent when crossing into California on March 18.  The

8  government's argument was proper.  Indeed, the court directed the jury to consider the March date with

9  Instruction 21.  CR 138 at 32; SER 162 ("the offense was committed 'on or about' March 18, 2014").

10     Further, Peel's attorney was not ineffective in his tactical decision-making.  Faced with

11  overwhelming evidence that Peel intended for the victim to engage in prohibited sexual activity as they

12  crossed into California on March 18, the attorney made a tactical decision to try to focus the jury on

13  other issues, specifically the earlier crossing into California on February 22 or 23.  ER 298, 299.  This

14  tactic may have confused one or more of the jurors, and was reasonable in light of the strength of the

15  government's evidence related to the March 18 crossing.   "[O]nce counsel reasonably selects a defense,

16  it is not deficient performance to fail to pursue alternative defenses."  *Rios v. Rocha*, 299 F.3d 796, 807

17  (9th Cir. 2002); *Phillips v. Woodford*, 267 F.3d 966, 980 (9th Cir. 2001).  "The law does not require

18  counsel to raise every available nonfrivolous defense."  *Knowles v. Mirzayance*, 556 U.S. 111, 127

19  (2009).

20     Peel bears the burden of establishing "a reasonable probability that, but for counsel's

21  unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at

22  669.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

23  *Strickland* asks "whether it is 'reasonably likely' the result would have been different."  *Harrington*, 562

24  U.S. at 111.  This does not require a showing that counsel's actions "'more likely than not altered the

25  outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not

26  standard is slight and matters 'only in the rarest case.'"  *Id.* at 112.  "The likelihood of a different result

27  must be substantial, not just conceivable."  *Id.*  Mr. Beevers made reasonable efforts to investigate the

28  case, vigorously litigated throughout the trial and sentencing, and executed calculated defense strategies

of discrediting witnesses.  His performance was sound and well within the scope of competent

representation.  Peel cannot meet his burden, and his petition should therefore be denied.

### d. Mr. Beevers thoroughly prepared for and presented solid arguments to the court at sentencing, concentrating on a constitutionally effective challenge to the government's aggravation evidence and offering mitigation evidence.

Peel claims that Mr. Beevers did not interview witnesses for sentencing nor present mitigation

evidence, including long-time drug use, health, work history, or family history.  CR 214.  Knowing his

audience, Mr. Beevers made tactical choices at sentencing aimed at the best chance for a reduced

sentence. Ex. 4 at pgs. 4, 6-7; SER 70-121.

Under the *Strickland* performance prong, there is a strong presumption that counsel's

performance falls "within the wide range of reasonable professional assistance." *Id*. at 689.  This is so

because for the defendant, "[i]t is all too tempting . . . to second-guess counsel's assistance after

conviction or adverse sentence. . . ." *Id*.  For the court, "it is all too easy to conclude that a particular act

or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685,

702 (2002) (discussing *Strickland*).  Both prongs of the *Strickland* test must be met "before it can be said

that a conviction (or sentence) 'resulted from a breakdown in the adversary process that render[ed] the

result [of the proceeding] unreliable' and thus in violation of the Sixth Amendment." *United States v.

Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687).

Mr. Beevers's performance at sentencing was adequate for at least three reasons.  First, Mr.

Beevers filed a lengthy memorandum and challenged the two sentencing enhancements; he later

vehemently argued for a reduced sentence.  CR 151, 158; ER 43-70; SER 70-121.  Second, Mr. Beevers

did, in fact, provide work history to the court and the court noted it.  CR 157 and 164; Ex. 4.  Third, Mr.

Beevers elected a sound sentencing strategy by putting the crime in context and by arguing that the

victim was a former prostitute who voluntarily got herself into this situation without Peel's help.  CR

164; Ex. 4; SER 70-121.  Peel and the victim simply ended up in a boyfriend/girlfriend relationship, he

argued, which started in a legal way under the laws of Nevada.  *Id*.  In putting the crime in context,

defense counsel demonstrated the lack of egregiousness based on the circumstances of the case and in

comparison to other types of similar cases.  *Id*.  Mr. Beevers painted Peel as not being a pedophile, but

rather, an adult male with a healthy romantic history—indeed, Peel had a previous long-term relationship with an adult female, Nicole Gorski, and Gorski loved Peel. *Id.* Defense counsel noted that the victim wrote a letter to the court wherein she asked for a probation sentence for Peel rather than imprisonment, which corroborated the defense strategy. *Id.*; CR. 162. Mr. Beevers did not believe that the court would be persuaded by age, health, or prior drug addiction; in fact, Mr. Beevers believed that those facts could undercut his sentencing strategy, or at least, not be helpful, so he stayed away from those factors. Ex. 4. In any event, those facts were already captured in trial testimony and in the Presentence Report (PSR). CR 157.

Using his professional judgment, Mr. Beevers focused on the areas where he thought Peel had the best chance for a reduced sentence. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on … information supplied by the defendant … In particular, what investigation decisions are reasonable depends critically on such information."). Mr. Beevers talked to Peel's family members, but they were relatives who did not know about his negative family characteristics. *See id.* (counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Ex. 4 and Ex. 6(a). Here, Mr. Beevers made a reasonable professional judgment to forego further efforts to identify and interview unidentified and undisclosed potential sentencing witnesses or evidence. Ex. 4. His judgment is entitled to "a heavy measure of deference" by this Court. *See Strickland*, 466 U.S. at 691. "[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Moreover, "[t]he test [under *Strickland*] has nothing to do with what the best lawyer would have done. Nor is the test even what most good lawyers would have done." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995). Rather, courts ask "only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* Here, the decisions by Mr. Beevers fell well within the spectrum of reasonable decision-making.

However, even if Mr. Beevers's performance were deficient in not arguing the mitigating facts of health, age, and drug use, Peel has not met the "highly demanding" standard that his sentence would have been different—that mitigating information was already before the Court, considered, and rejected.

33

1  Even if the Court considered Peel's prejudice argument, which it need not, he cannot demonstrate that

2  the outcome of his sentence would have been any different if Mr. Beevers had interviewed more

3  witnesses searching for mitigation or argued minor details of Peel's past like his age and health.  Those

4  details, already in the record, would have unnecessarily wasted time that Mr. Beevers used on more

5  important arguments.  Peel cannot demonstrate prejudice and his claim must fail.

6          Further, even if Mr. Beevers had found helpful witnesses, they would have been hopelessly

7  biased because they are Peel's family members and close friends.  Numerous courts have found that

8  failure to call family members or friends with close relationships to the defendant did not give rise to an

9  ineffective assistance of counsel claim.  *See Seymour v. Walker*, 224 F.3d 542, 556 (6th Cir. 2000)

10  (counsel not defective for failing to call witness/sister who "would likely be considered by the jury to be

11  biased"); *McCauley–Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996) (finding no prejudice from

12  counsel's failure to call witnesses because impact of uncalled witness would have been negligible due to

13  their close relationship to defendant); *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995)

14  (counsel not ineffective for failing to call family members who would easily have been impeached for

15  bias); *Romero*, 46 F.3d at 1030 (testimony by defendant's family members is of "significantly less

16  exculpatory value than the testimony of an objective witness").

17          Peel has failed to prove that any failure to investigate undisclosed mitigation witnesses was

18  prejudicial.  Peel fails to even proffer which witnesses would have been helpful or which witnesses

19  would have been sufficiently credible to cause the court to have reached a reduced sentence.

20  Accordingly, this Court should deny the petition.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**C. MR. BEEVERS EFFECTIVELY HANDLED PEEL'S *FARETTA* ISSUE BECAUSE PEEL WITHDREW HIS REQUEST TO REPRESENT HIMSELF (GROUND TWO)[29]**

### 1. Mr. Beevers was not ineffective when he followed his client's wishes to withdraw the *Faretta* request.

Peel alleges that Mr. Beevers was ineffective by failing to inform the Court about Peel's desire to represent himself pursuant to *Faretta* prior to empaneling a jury and by withdrawing Peel's handwritten request to the judge without Peel's consent.  CR 214.  However, a review of the transcripts of the *Faretta* inquiries on May 23, 2014 (the first status hearing), August 22, 2014 (the trial confirmation hearing), November 6, 2014 (the second day of trial), and November 12, 2014 (the third day of trial) and Mr. Beevers's fulsome declaration amply demonstrate that Peel did not unequivocally request to represent himself.  SER (Sealed) 754-66; SER (Sealed) 785-86; SER (Sealed) 819; CR, 12, 14, 15, 20-35; Ex. 4 at pgs. 4-5 and Ex. 6(b) at pgs. 20-30.

While a defendant has a right to represent himself at trial under *Faretta v. California*, 422 U.S. 806, 819 (1975), if properly advised of the dangers of self-representation, a court's denial of that right is not constitutionally actionable unless the request for self-representation was "unequivocal, timely, and not made for the purpose of delay."  *Robinson v. Kramer*, 588 F.3d 1212, 1216 (9th Cir. 2009).  Peel's request was indeed unequivocal—he decidedly did *not* want to represent himself and so informed the Court on more than one occasion.  Over the course of his case, he wavered (or pretended to) several times, but, at no point, did he unequivocally tell the Court that he wanted to represent himself.  *See* CR 12, 14, 171; SER (Sealed) 785-86; 819.  For example, in a *Faretta* colloquy with the Court on August 22, 2014, Peel expressed a strong desire not to represent himself.  In response to the Court's inquiry about representing himself, Peel responded: "Oh, no, sir.  No, sir.  I'm not – I'm not by any means capable of representing myself . . . I would not ever consider that . . . believe me, I thought of it, but I

---

[29] Appellate counsel alleged that the district court erred by improperly handling the *Faretta* issue.  *See United States v. Peel*, 747 Fed. Appx. 498 (9th Cir. 2018).  On plain error review, the Court rejected the argument because Peel told the court several times that he did not want to represent himself. To the extent this court finds that this same issue was raised on direct appeal, a Section 2255 motion may not raise claims that the petitioner has had a full opportunity to be heard on during the criminal trial phase and direct appeal.  *Massaro v. United States*, 538 U.S. 500 (2003).  "[A] collateral attack is the 'same case' as the direct appeal proceedings for purposes of the law of the case doctrine."  *United States v. Jingles*, 702 F.3d 494, 500 (9th Cir. 2012) (citing *Odom v. United States*, 455 F.2d 159, 160 (9th Cir. 1972).  Thus, claims that were pursued and decided on direct appeal cannot be relitigated in a subsequent Section 2255 proceeding.

just know better . . . I better not."  SER (Sealed) 785-86.  Likewise, on November 6, 2014, Peel told his

counsel, who then relayed to the Court, that Peel did not want to represent himself.  ER 20-22; Ex. 4 at

pgs. 4-5.  Again, on November 12, 2014, Peel and the Court discussed Peel's request to represent

himself.  ER 24-35.  Based on the exchange, ultimately, the Court did not find that Peel met the *Faretta*

standard to represent himself.  ER 24-35.  Moreover, Peel's continued acquiescence in Mr. Beevers's

representation throughout trial evidences, at the very least, the equivocal nature of his request for self-

representation, and at most, his strong desire to *not* represent himself.

> **2.  Peel requested to represent himself, and then changed his mind, providing the path for Mr. Beevers to continue representing him.**

Peel only had the right to self-representation if the Court had ascertained that he had voluntarily

and intelligently elected to do so, irrespective of how unwise such a choice might appear to be.  Unlike

the right to representation by counsel, however, the right of self-representation is waived unless the

defendant articulately and unmistakably demands to proceed *pro se*.  *See Tamplin v. Muniz*, 2016 U.S.

Dist. LEXIS 34814.  Under *Faretta*, an insincere request or one made under the cloud of emotion may

be denied.  A motion for self-representation made out of a temporary whim, or out of annoyance or

frustration, is not unequivocal.  *Faretta*, 422 U.S. at 819-22.

Peel and Mr. Beevers dispute whether Peel asked Mr. Beevers to withdraw the letter on the

second day of trial.  The Court need not resolve that dispute:  the contemporaneous colloquies between

the Court and Peel confirm that Peel never wanted to represent himself.  Ex. 4 at pgs. 4-5.  On

November 6, 2014, Mr. Beevers purported to act on Peel's request to withdraw the handwritten *Faretta*

letter to the Court because Peel had previously given Mr. Beevers his consent to do so.  ER 20-22.  Even

though Peel, on November 12, 2014, told the Court that he did not withdraw the letter and that he did

not confer with his counsel, Peel also told the Court that he did not want to represent himself.[30]  ER 24-

35.  In a direct response to the Court's question about requesting to represent himself, Peel told the

Court "no."  The Court found that Peel's request to continue with counsel was unequivocal stating, "[I]t

---

[30] The timing of Peel's attempt to fire his attorney and refile the document he withdrew on
November 6 appeared to be a last-ditch effort to interrupt the trial and "to postpone a final inquiry into
his" alleged crimes before Gorski and the victim testified.  *See United States v. Romero*, 640 F.2d 1014,
1016 (9th Cir. 1981) ("Courts are established at public expense to try issues, not to play games.").

appears to me that he was clear. He does not want to represent himself."[31]    ER 30-31.[32]    Moreover, Mr.

Beevers told the Court, in front of Peel, that the two had discussed the issue and that Peel did not want to

pursue it and Peel did not disagree. ER 25-32. Based on Peel's unequivocal desire to be represented by

counsel, he cannot show that he did, in fact, want to represent himself and therefore that he suffered

prejudice. Even if Peel had asserted, on November 12 (the third day of trial), that he wanted to represent

himself, his request would have been untimely and the Court would have been under no obligation to

grant that request. *United States v. Smith*, 780 F.2d 810, 811 (9th Cir. 1986) ("a demand for self-

representation is timely if made before meaningful trial proceedings have begun.").

### D. MR. BEEVERS'S CONSIDERED AND STRATEGIC DECISION TO NOT REQUEST ACCESS TO THE VICTIM PRETRIAL AND TO NOT INFORM THE COURT ABOUT THE VICTIM'S WHEREABOUTS PRETRIAL SATISFIES *STRICKLAND* (GROUND ELEVEN).

Mr. Beevers's decision not to request a pretrial interview with the victim was reasonable,

prudent, and effective. The relevant legal question is whether Mr. Beevers's decision was reasonable at

the time he made it:

> Once we conclude that declining to investigate further was a reasonable
> act, we do not look to see what a further investigation would have
> produced. Nor do we need to decide whether the information that would
> have resulted from further investigation would have necessarily been used
> at trial by every reasonable lawyer who was armed with such information.
> If the act of conducting no investigation of a particular defense is
> reasonable, the matter is closed; there can be no question about the
> reasonableness of having failed to present evidence of which the lawyer
> was unaware as a result of a reasonable decision to investigate no further.

*Rogers v. Zant*, 13 F.3d at 388.

Mr. Beevers made an informed and reasonable decision not to request from the court a pretrial

interview with the victim. Ex. 4 at pgs. 8-9; Ex. 6(a) at pgs. 1-11. First, he did not have a legal

justification nor factual support to request the interview from the judge. Ex. 4 at pgs. 8-9. Peel cites no

---

[31] The district court found that Peel's request was, in fact, a request for a new attorney—not a request to represent himself. The court denied the request.

[32] Although six calendar days elapsed between November 6 and November 12, Judge Burrell's Tuesday-through-Thursday trial calendar—combined with the federal Veteran's Day holiday on Tuesday November 11—meant that Peel's unequivocal denial of a desire to represent himself on November 12 was made on the very next trial day after Mr. Beevers withdrew the letter on November 6.

authority that he was even entitled to a pretrial interview.  Although defendants possess a right under the Sixth Amendment to confront witnesses against them at trial, the Confrontation Clause does not include an equivalent right to conduct pretrial interviews of those witnesses.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 52-53, 107 (1987).  Second, Mr. Beevers already had a significant amount of helpful data in which to impeach the victim, and a pretrial interview would not have borne fruit in his estimation.  Ex. 4; Ex. 6(a) at pgs. 1-11.  That being the case, what he might have discovered had he decided to request (and been granted) a pretrial interview is legally irrelevant to a determination of his constitutional effectiveness.  The record establishes that Mr. Beevers's decisions in this regard were reasoned and strategic given the information the defense had already.  Accordingly, this Court should deny Peel's ineffective assistance of counsel claim and need not even consider evidence of alleged prejudice.

Should the Court consider the prejudice prong, to meet his burden of establishing prejudice, Peel must show that "[t]he likelihood of a different result [is] substantial, not just conceivable."  *Harrington*, 562 U.S. at 112.  He cannot meet this burden for three reasons.  First, he speculates, without support, that not requesting the interview affected the verdict.  Bare speculation about potential witnesses' testimony, without actual evidence what the witnesses would have testified about, cannot show ineffectiveness or prejudice.  *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988).  Second, Mr. Beevers vigorously challenged the victim's testimony through thorough cross-examination and presented her as not credible.  ER 195-270.  One additional witness interview would not have tipped the scales toward a different verdict.  *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").  Third, as described above, Mr. Beevers did not have facts or legal justification to support his request to the Court, so it was likely that the Court would have denied any request for a pretrial interview.  Ex. 4 at pg. 9.  *See Lowry*, 21 F.3d 344 at 346-47 (not ineffective to fail to assert motion to suppress that counsel knew would not succeed).  In light of the above, Peel cannot show prejudice as a matter of law and the Court should deny his motion.

///

///

///

### E. MR. BEEVERS EFFECTIVELY HANDLED THE JURY INSTRUCTIONS AND PEEL HAS NOT ESTABLISHED PREJUDICE (GROUND TEN).

Peel alleges that Mr. Beevers was ineffective for his role in handling and/or his failure to object to Jury Instruction No. 22, the Nevada state law instruction. CR. 214. In particular, Peel claims that the instruction was unconstitutional, and it put Peel in a negative light, which supported the government's case. *Id*.

Mr. Beevers was not ineffective for failing to make a frivolous objection and, instead, correctly understood that the government properly applied the law. ER 5-6; ER 16; ER 36-60; SER 713-26; CR 179; Ex. 7 ("11/18/14 Tr.") at 12:8-25; 13:1–14. As a matter of law, it is simply not ineffective to fail to file a frivolous and futile motion. *See James v. Borg*, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel"); *Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir. 1989) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."); *see also United States v. Nolan*, 910 F.2d 1553, 1564 (7th Cir. 1990) ("It is not ineffective assistance for counsel to not file a meritless (*Miranda*) motion.").

Mr. Beevers did in fact, partially, object to the jury instruction if it did not include language regarding the age of consent in Nevada. SER 713-26; CR 179; Ex. 7 ("11/18/14 Tr.") at 12:8-25; 13:1–14. Without government objection, the Court added Mr. Beevers's suggested language. *Id*. Mr. Beevers did not object to the remaining portions of Jury Instruction No. 22 because they accurately captured the law in Nevada. *Id*; Ex. 4 at p. 9.

Consequently, it was not ineffective for Mr. Beevers to withhold a frivolous objection to an accurate statement of law, and this Court should dismiss any claims based on counsel's failure to object to the jury instruction as written. Moreover, Mr. Beevers introduced corrections, edits, and amendments to Jury Instruction No. 22 in the light most favorable to Peel.[33] Peel has shown no prejudice that could

---

[33] Instructional issues were raised on appeal and rejected. The Ninth Circuit found: "The district court did not plainly err by not instructing the jury that (a) the government had to prove that Defendant knew that L.P. was under 18 years old and (b) he knew that the conduct that he intended to engage in with L.P. was a criminal offense. *See Olano*, 507 U.S. at 731 (stating the plain error standard of review when a party fails to object). Knowledge of the victim's age is not a required element under § 2423(a). *United States v. Brooks*, 610 F.3d 1186, 1195 (9th Cir. 2010). Nor was the government required to prove that Defendant knew that it was a crime in California for him to have sex with a 16-year-old girl, because ignorance of the law does not excuse criminal conduct. *Lambert v. California*, 355 U.S. 225, 228 (1957)." In addition, the Ninth Circuit found: "The district court did not abuse its discretion by

have resulted from Mr. Beevers withholding a frivolous objection to the government's correct statement of law.

## F.   APPELLATE COUNSEL WAS CONSTITUTIONALLY EFFECTIVE WHEN HE RAISED ALL MERITORIOUS CLAIMS, WHICH THE NINTH CIRCUIT REJECTED (GROUNDS FOUR, SEVEN, NINE, AND THIRTEEN).

Peel alleges that appellate counsel failed to raise a sentencing disparity issue and the perceived sarcasm directed toward him by the District Court.[34]  Peel's experienced appellate counsel, however, raised all meritorious claims.  Ex. 5.  By doing so, Peel's appellate attorney was indeed effective and this Court should deny these claims.

Claims of ineffective assistance of appellate counsel are reviewed under the same two-pronged *Strickland* standard used to review the representation provided by trial counsel.  *Bailey v. Newland*, 263 F.3d 1022, 1028 (9th Cir. 2001).  However, even before *Strickland*, the Supreme Court held that a petitioner does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal.  *Jones v. Barnes*, 463 U.S. 745, 754 (1983).  Here, counsel raised several issues on appeal including sufficiency of the evidence, variance/constructive amendments, ineffective assistance of trial counsel, obstruction of justice sentencing enhancement application, the *Faretta* issue, and error by the District Court in instructing the jury on certain elements and an affirmative defense.  Nevertheless, the Ninth Circuit rejected all claims and affirmed Peel's conviction and sentence.  *See United States v. Peel*, 747 Fed. Appx. 498 (9th Cir. 2018).

Eliminating weaker issues with little or no likelihood of success "is widely recognized as one of the hallmarks of effective appellate advocacy."  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

---

failing to instruct the jury that, under California law, Defendant could not be convicted if he reasonably believed that L.P. was at least 18 years old.  *See United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997) (stating the abuse of discretion standard of review).  Because that rule is merely an affirmative defense under California law, rather than an element of the federal crime, there was no error.  *Brooks*, 610 F.3d at 1195.  And, even if the district court had erred, any error would have been harmless because both Defendant's girlfriend and L.P.'s sister told Defendant that L.P. was 16 years old.  *See United States v. Shaw*, 885 F.3d 1217, 1219 (9th Cir. 2018) (holding that instructional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty despite the error)."

[34] In his § 2255 petition, Peel suggests non-sensically that his appellate counsel should have filed an *Anders* brief.  *Anders v. California*, 386 U.S. 738 (1967).  An *Anders* brief, however, would have stated Petitioner had no meritorious issues to raise on appeal.

Weak issues are a distraction from the stronger issues in a case and lessen counsel's credibility with the court. *Id*. Therefore, "a lawyer who throws in every arguable point – 'just in case' – is likely to serve her client less effectively than one who concentrates solely on the strong arguments." *Id*. Because counsel is not required to raise *every* argument, especially not weak ones, it follows that Peel's counsel's experienced and considered judgment to not raise the sentencing disparity issue and a perceived sarcastic sleight by the District Court was wholly effective. This Court should therefore dismiss this claim.

### G. PEEL'S CLAIMS OF PERCEIVED JUDICIAL UNFAIRNESS/BIAS OR PROSECUTORIAL MISCONDUCT ARE SPECULATIVE AND LACK MERIT (GROUND NINE).

To the extent Peel alleges that the government failed to inform the District Court about the victim's changed testimony; that the Court "suppressed" his [Peel's] evidence; or that the Court treated or sentenced him unfairly, these claims are baseless. Essentially, Peel, without evidence and without legal support, suggests that the government and the Court did not do their jobs in protecting his rights. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). These arguments should be rejected for three reasons.

First, the government did in fact turn over information about the victim's inconsistent pretrial statement(s) in an email. Ex. 6(a) at pgs. 1-2. *United States v. Espinoza*, 866 F.2d 1067, 1069 (9th Cir. 1988) (explaining court's power to dismiss claims "conclusively decided on the basis of documentary testimony and evidence in the record" quoting *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988)); *see also Blackledge v. Allison*, 431 U.S. 63, 75–76 (1977) (vague or palpably incredible or frivolous allegations warrant summary dismissal of a petition for habeas corpus). Based on this factual refutation of Peel's prosecutorial misconduct claim, it should be dismissed.

Second, in some cases the victim's changed story on the stand happened in real time without government advanced knowledge, and the defense was aware of it. "A prosecutor can never guarantee that a witness will not commit perjury. Her duty is to refrain from knowingly presenting perjured testimony...." *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir.1991). And, where the alleged

perjury occurs during examination by the defense, no prosecutorial misconduct can be found. *Id*. *See Runningeagle v. Ryan*, 686 F.3d 758, 770 (9th Cir. 2012) (denying unsupported *Brady* claim based on "inference and supposition."). *See also, Aichele*, 941 F.2d at 764 ("When a defendant has the opportunity to present impeaching evidence to the jury, [], there is no prejudice in the preparation of his defense."). This Court should deny these unsupported and refuted claims.

Third, Peel's disagreement with the trial court's rulings and sentence does not warrant relief here, and any perceived slights by the judge are likewise without support in the record. The Supreme Court recently summarized the law related to judicial bias:

> Due process guarantees "an absence of actual bias" on the part of a judge. Bias is easy to attribute to others and difficult to discern in oneself. To establish an enforceable and workable framework, the Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present. The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, "the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'"

*Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905, 195 L. Ed. 2d 132 (2016). Peel must also overcome the presumption that judges act with honesty and integrity. *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008). Peel's interpretation of the Court's adverse rulings, severe sentence, and colloquies as somehow bias against him strains credulity. Nothing in the record suggests any judicial bias. And, as such, a court should not grant habeas relief on the basis of little more than speculation. Therefore, this Court should deny relief on Peel's claim of judicial bias.

///

///

///

///

///

///

///

///

## VII.  **CONCLUSION**

Peel has failed to meet his burden to demonstrate that Mr. Beevers or appellate counsel provided him with incompetent or prejudicial representation under the *Strickland* standard for ineffectiveness. The trial and appellate records, Mr. Beever's sworn declaration, appellate counsel's email, and the other evidence developed herein fail to support Peel's claims.  Therefore, this Court should deny each of Peel's claims of ineffective assistance of counsel and deny the petition.

Further, Peel's other claims are speculative and lack evidentiary support.  As such, Peel cannot demonstrate that any of these additional claims were material or establish prejudice.  This Court should deny the petition in full without an evidentiary hearing.

Dated:  May 20, 2021

PHILLIP A. TALBERT
Acting United States Attorney

By:     /s/ JILL THOMAS
JILL THOMAS
Assistant United States Attorney

43